ALLSTATE SAVINGS & LOAN ASSOCIATION, SUCCESSOR IN INTEREST TO METROPOLITAN SAVINGS & LOAN ASSOCIATION OF LOS ANGELES, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1674–74. Filed June 7, 1977.

*Robert J. Wynne,* for the petitioner.
*Stephen B. Zorick, Jr.,* for the respondent.

OPINION

FEATHERSTON, *Judge:* Respondent determined the following deficiencies in petitioner's Federal income taxes as successor in interest to Metropolitan Savings & Loan Association of Los Angeles:

| | |
|---|---|
| 1968 | $47,207 |
| 1969 | 7,975 |

Other issues having been settled by the parties, the only issue for decision is whether commissions and other selling expenses incurred by petitioner in disposing of foreclosed property are deductible under section 162[1] or are chargeable to the reserve for losses from qualified loans pursuant to section 595.

All the facts are stipulated.

Metropolitan Savings & Loan Association of Los Angeles (hereinafter Metropolitan) was organized on or about June 16, 1936, under the laws of the State of California, as a domestic savings and loan association. Petitioner Allstate Savings & Loan Association (hereinafter Allstate or petitioner) is the successor in interest to Metropolitan which merged with petitioner on June 30, 1970. Pursuant to the merger, petitioner succeeded to all rights in the property of, and became subject to all debts and liabilities of, Metropolitan. During 1968 and 1969, Metropolitan reported its income on the basis of the calendar year, utilizing the cash receipts and disbursements method of accounting. Metropolitan used the reserve method in deducting its bad debt losses as provided by sections 593(b) and 166(c).

Metropolitan's principal activities during the years in issue consisted of acquiring cash savings from the public and lending money. Its loans primarily were loans secured by real property. Under California law, real property loans made by Metropolitan during the base period[2] could not exceed a prescribed percentage of the value of the property securing them. Pursuant to standards prevailing in the California savings and loan industry during the base period, the appraised value of security property was not diminished by such anticipated acquisition and resale costs as brokerage commissions and other selling expenses.

Periodically throughout Metropolitan's operations, borrowers defaulted in the payment of real property loans or in the performance of other obligations imposed under the terms of deeds of trust securing payment of the loans. In order to collect on these defaulted loans, Metropolitan was required to initiate foreclosure proceedings. In each foreclosure case

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

[2] "Base period" means the period beginning Jan. 1, 1960, and ending June 30, 1970.

during the base period, Metropolitan acquired such property through nonjudicial foreclosure, usually by exercise of a power of sale granted the lender under the terms of a trust deed. Once the property was acquired through foreclosure, Metropolitan attempted to dispose of it as soon as possible in order to maximize recovery of the loan for which the property was security.

As a result of its acquisition of property under foreclosure proceedings, Metropolitan paid or incurred various foreclosure expenses. Under California law, each parcel of property was the sole security for the loan, and the borrowers were not accountable for any foreclosure expenses paid or incurred by Metropolitan.

During 1968, Metropolitan sold 40 tracts of foreclosed real estate at an aggregate selling price of $4,262,600 and, on its 1968 Federal income tax return, deducted the $223,546 of brokerage commissions as ordinary and necessary business expenses under section 162(a). During 1969, Metropolitan sold 17 tracts of foreclosed real estate at a gross selling price aggregating $1,532,593 and deducted direct postforeclosure expenses in the total amount of $37,764.[3]

On December 17, 1973, respondent determined deficiencies in Metropolitan's Federal income taxes for 1968 and 1969, denying the deduction claimed by Metropolitan under section 162(a) for commission and other expenses paid or incurred in selling foreclosed property. Respondent further determined that such commission and other expenses should be treated under section 595 as costs of disposing of such property, thereby increasing Metropolitan's reserve for bad debts for those years.

---

[3] The following items of direct postforeclosure expenses were included in the deduction:

| | | | |
|---|---:|---|---:|
| Loan costs | $505.00 | Bonds | 3,095.16 |
| Title costs | 5,409.49 | Recording fees | 25.60 |
| Brokerage commissions | 11,753.00 | Tax service and credit | |
| Insurance prorations | 3,072.16 | report fees | 80.00 |
| Escrow fees | 2,493.20 | Veterans' Administration | |
| Document fees | 95.00 | fees | 275.00 |
| Inspection fees | 2,795.80 | Refurbishing costs | 4,447.00 |
| | | Rent prorations | 2,030.19 |

Under section 595(a),[4] a building and loan association which, at a foreclosure sale, bids in security property as a general rule does not recognize gain or loss and does not become entitled to a bad debt deduction at that time.[5] Rather, under section 595(b), the property so acquired is considered, for purposes of section 166, as "property having the same characteristics as the indebtedness for which such property was security." Any "amount realized" by the association with respect to such property is treated as a payment on account of the indebtedness, and any loss with respect thereto is treated as a bad debt to which section 166 shall apply.

In the case of an organization which accounts for bad debt losses through reserves, as does petitioner, the net effect of section 595(a) and (b) is to defer recognition of gain or loss as a result of a foreclosure until such time as the creditor sells or otherwise disposes of the foreclosed property. The association's investment in the borrower's indebtedness is carried forward in the form of the security property. Upon the property's sale, the gain or loss is treated as a credit or charge to the bad debt reserve, as the case may be, depending upon the results of the sale. Under section 595(c), such gain or loss is to be computed by using the basis of the indebtedness as the

---

[4] Sec. 595 states, in part, as follows:

SEC. 595. FORECLOSURE ON PROPERTY SECURING LOANS.

(a) NONRECOGNITION OF GAIN OR LOSS AS A RESULT OF FORECLOSURE.—In the case of a creditor which is an organization described in section 593(a), no gain or loss shall be recognized, and no debt shall be considered as becoming worthless or partially worthless, as the result of such organization having bid in at foreclosure, or having otherwise reduced to ownership or possession by agreement or process of law, any property which was security for the payment of any indebtedness.

(b) CHARACTER OF PROPERTY.—For purposes of sections 166 and 1221, any property acquired in a transaction with respect to which gain or loss to an organization was not recognized by reason of subsection (a) shall be considered as property having the same characteristics as the indebtedness for which such property was security. Any amount realized by such organization with respect to such property shall be treated for purposes of this chapter as a payment on account of such indebtedness, and any loss with respect thereto shall be treated as a bad debt to which the provisions of section 166 (relating to allowance of a deduction for bad debts) apply.

(c) BASIS.—The basis of any property to which subsection (a) applies shall be the basis of the indebtedness for which such property was secured (determined as of the date of the acquisition of such property), properly increased for costs of acquisition.

[5] This general rule is subject to the qualification that if a proper appraisal establishes that the fair market value of the acquired property is less than the adjusted basis of the property, the association may treat the difference as a worthless debt and may so treat further declines in value. Sec. 1.595–1(e)(1), Income Tax Regs.

basis for the security property, determined as of the date of acquisition and "properly increased for costs of acquisition."

Section 595 says nothing specifically about how to handle the costs of disposing of the foreclosed property, such as brokerage commissions, title costs, revenue stamps, escrow fees, and other similar expenses. Petitioner contends that such expenses are separately deductible under section 162(a) as ordinary and necessary business expenses and do not affect the adjustment to the bad debt reserve. Respondent maintains that those expenses reduce the amount to be applied on the former owner's indebtedness and should be taken into account in computing the amount of the credit or charge to the bad debt reserve.

We agree with respondent.

Prior to 1952, domestic building and loan associations were exempt from Federal income tax. The Revenue Act of 1951 subjected them to a regular corporate income tax but allowed a special deduction for additions to bad debt reserves. This special deduction proved to be so large that such organizations remained virtually tax exempt until the Revenue Act of 1962 added sections 593 and 595 to the 1954 Code. H. Rept. 1447, 87th Cong., 2d Sess. 32 (1962), 1962–3 C.B. 703, 746.

The principal technique adopted in sections 593 and 595 for subjecting these organizations to heavier Federal income taxes was a drastic modification of the bad debt reserve provisions. Under section 593(c), these associations were directed to maintain three accounts to which additions were to be made with respect to bad debts: (1) A reserve for "losses on qualifying real property loans," (2) a reserve for "losses on nonqualifying loans," and (3) a supplemental reserve for losses on loans. See *Leesburg Federal Savings & Loan Association v. Commissioner*, 55 T.C. 378, 383 (1970). The additions to the first two of these reserves are designed to determine the amount deductible under section 166(c) as a reasonable addition to the reserve for bad debts. These two accounts function "as a substitute for deduction of debts as they are determined to be worthless." *Levelland Savings & Loan Assoc. v. United States*, 421 F.2d 243, 246 (5th Cir. 1970).[6]

---

[6] S. Rept. 1881, 87th Cong., 2d Sess. (1962), 1962–3 C.B. 703, 751, explains:

"The reserves which are required by the bill to be established—that is, the reserve

Additions to the reserve for losses on qualifying real property loans, which are involved in the instant case, are to be made pursuant to certain prescribed methods, including the "percentage of taxable income method."[7] Under this method, used by Metropolitan during the years in controversy, an amount determined to be to the excess of 60 percent of the taxable income (computed without this deduction) over the amount allowed for nonqualifying loans was to be added to the bad debt reserve. But the addition could not exceed the amount necessary to increase the balance as of the close of the taxable year to 6 percent of the loans outstanding at such time and was subject to other limitations not pertinent in this case.

For the years in controversy, petitioner claimed and was allowed the maximum permissible addition to its reserve for losses from qualifying loans and, consequently, the maximum permissible bad debt deduction under section 166. In addition, petitioner deducted under section 162 the expenses incurred

---

for losses on qualifying real property loans, the reserve for losses on nonqualifying loans, and the supplemental reserve for losses on loans—are required to be treated as bad-debt reserves for all tax purposes (except that no deduction is allowed for any addition to the supplemental reserve). Thus, although these reserves are termed reserves for 'loans,' they are reserves for bad debts; * * *"

[7] This method is prescribed by sec. 593(b)(2) which, in the form in effect during 1968 and 1969, is as follows:

(b) ADDITION TO RESERVES FOR BAD DEBTS.—

(1) IN GENERAL.—For purposes of section 166(c), the reasonable addition for the taxable year to the reserve for bad debts of any taxpayer described in subsection (a) shall be an amount equal to the sum of—

(A) the amount determined under section 166(c) to be a reasonable addition to the reserve for losses on nonqualifying loans, plus [amounts computed pursuant to prescribed methods, including the percentage of taxable income method]
* * *

(2) PERCENTAGE OF TAXABLE INCOME METHOD.— The amount determined under this paragraph for the taxable year shall be the excess of—

(A) an amount equal to 60 percent of the taxable income for such year, over

(B) the amount referred to in paragraph (1)(A) for such year,

but the amount determined under this paragraph shall not exceed the amount necessary to increase the balance (as of the close of the taxable year) of the reserve for losses on qualifying real property loans to 6 percent of such loans outstanding at such time. For purposes of this paragraph, taxable income shall be computed (i) by excluding from gross income any amount included therein by reason of subsection (f), and (ii) without regard to any deduction allowable for any addition to the reserve for bad debts.

By subsequent legislation, the percentage has been scaled downward and other changes not here pertinent have been made.

in selling the foreclosed property, and respondent denied those deductions.[8]

While there are ambiguities in section 595, we agree with respondent that the most reasonable interpretation of the section is that all the tax results of foreclosures, including the expense of disposing of the foreclosed property, are to be accounted for through adjustments to the association's reserve for losses from qualifying loans. The foreclosed property becomes a substitute for the debt. Any amount realized with respect to such property is treated as a payment on account of the debt, and any loss with respect to such property is treated as a bad debt.

Prior to the enactment of section 595(a), gain or loss on a foreclosure, where a creditor-association bought in mortgaged property, was measured by the difference between the amount of the obligations of the debtor applied to the purchase or bid price and the fair market value of the foreclosed property.[9]

---

[8] The notice of deficiency issued to petitioner explains the adjustment in dispute as follows:

(g) It is determined that commission expenses of $223,546.00 in 1968 and $37,764.00 in 1969 are not deductible under section 162 of the Internal Revenue Code. Such expenditures are part of a cost of sale of REO (Real Estate owned) property and as such are chargeable to the reserve for losses from qualified loans under section 595 of the Internal Revenue Code. Accordingly, the taxable income is increased by $223,546.00 in 1968 and by $37,764.00 in 1969.

(h) It is determined that you are entitled to a bad debt deduction of sixty percent of the increase to taxable income resulting from adjustment (g) above. The allowance is per section 593 of the Internal Revenue Code. Computation is as follows:

|      | Increase to taxable Income | Adjustment   |
| ---- | -------------------------- | ------------ |
| 1968 | $223,546.00×60% =          | $134,128.00  |
| 1969 | 37,764.00×60% =            | 22,658.00    |

Accordingly, the taxable income is decreased by $134,128.00 in 1968 and by $22,658.00 in 1969.

[9] Sec. 1.166–6(b), Income Tax Regs., on sales of mortgaged or pledged property is as follows:

(b) *Realization of gain or loss*—(1) *Determination of amount.* If, in the case of a sale described in paragraph (a) of this section, the creditor buys in the mortgaged or pledged property, loss or gain is also realized, measured by the difference between the amount of those obligations of the debtor which are applied to the purchase or bid price of the property (to the extent that such obligations constitute capital or represent an item the income from which has been returned by the creditor) and the fair market value of the property.

(2) *Fair market value defined.* The fair market value of the property for this purpose shall, in the absence of clear and convincing proof to the contrary, be presumed to be the amount for which it is bid in by the taxpayer.

Upon the subsequent sale of property, still another taxable event occurred, with the creditor-association recognizing capital gain or loss or ordinary gain or loss, depending on whether the foreclosed property was a capital asset, property held primarily for sale in the ordinary course of business, or real property used in the taxpayer's business. S. Rept. 1881, 87th Cong., 2d Sess. 47 (1962), 1962–3 C.B. 704, 753; sec. 1.166–6(c), Income Tax Regs.

Sections 593 and 595, as we read them, were intended to telescope the foreclosure, purchase, and resale of such property and treat them as a single transaction so that there would be only one taxable event rather than two. And the tax consequences of that single event were to be determined not by reporting the gain or loss on the sale of the foreclosed property, as such, but through a credit or charge to the reserve for losses on qualifying real property loans. If the amounts received from the sale of the property are less than the unpaid indebtedness, a charge will be made to the reserve account. If such amounts exceed the indebtedness, a credit is made to that account. The proper charge or credit to the reserve account can be computed only by taking selling expenses as well as foreclosure costs into account. Thus, S. Rept. 1881, 87th Cong., 2d Sess. 48 (1962), 1962–3 C.B. at 754, explains:

When the property is ultimately sold or disposed of, the difference between any amount realized and the original or previously reduced debt, is to be treated as ordinary loss or income and is to be charged, or credited, as the case may be, against the reserve for losses on qualifying real property loans.

Petitioner pins its case mainly upon the technical terms used in section 595.

First, petitioner has pointed out that section 595(b) provides that the foreclosed property "shall be considered as property having the same characteristics as the indebtedness for which such property was security." Since the costs of servicing indebtedness due an association are deductible as business expenses under section 162(a), petitioner has argued that the costs of liquidating foreclosed property should be similarly so deductible. But this argument overlooks the fact that the section 595(b) language on which petitioner relies is introduced with the limitation "For purposes of sections 166 and 1221." No mention is made of section 162(a). If any implica-

tion is to be drawn from this language, it is that the absence of any reference to section 162(a) reflects a congressional intent that all expenses, including those related to the sale of the foreclosed property, are to be treated under the section 166 bad debt provisions.

Next, petitioner maintains that the term "amount realized," used in the second sentence of section 595(b), has the same meaning as it is given in section 1001(b)—"the sum of any money received plus the fair market value of the property (other than money) received." Thus, petitioner would read section 595(b) to provide that the gross proceeds of the sale of foreclosed property, undiminished by any selling expenses, should be treated as a payment on the indebtedness, leaving the selling expenses to be separately deducted under section 162(a).

But "amount realized" as used in the Code is not always limited by the literal provisions of section 1001(b). It is a term which takes its meaning from the context in which it is used. It may include the amount of a mortgage assumed by the purchaser or even the amount of a mortgage to which the property was subject at the time of the sale. *Crane v. Commissioner*, 331 U.S. 1, 13–14 (1947); *Parker v. Delaney*, 186 F.2d 455, 457–458 (1st Cir. 1950). In connection with the sale or exchange of residences under section 1034, the "amount realized" is computed by subtracting from the consideration received upon the sale precisely the same kinds of expenses as are here in dispute—commissions and expenses of advertising the property for sale, of preparing the deed, etc. Sec. 1.1034–1(b)(4), Income Tax Regs.[10]

---

[10] Sec. 1.1034–1(b)(4), Income Tax Regs., provides as follows:

(b) *Definitions.* The following definitions of frequently used terms are applicable for purposes of section 1034 (other definitions and detailed explanations appear in subsequent paragraphs of this regulation):

\* \* \*

(4) "Amount realized" is to be computed by subtracting

(i) The amount of the items which, in determining the gain from the sale of the old residence, are properly an offset against the consideration received upon the sale (such as commissions and expenses of advertising the property for sale, of preparing the deed, and of other legal services in connection with the sale); from

(ii) The amount of the consideration so received, determined (in accordance with section 1001(b) and regulations issued thereunder) by adding to the sum of any money so received, the fair market value of the property (other than money) so received. If, as part of the consideration for the sale, the purchaser either assumes a liability of the taxpayer or acquires the old residence subject to a liability (whether or not the taxpayer is personally liable on the debt), such assumption or acquisition, in the

The Senate Committee Report accompanying the enactment of section 595 in explaining the operation of the section uses both the term "amount received" and the term "amount realized." S. Rept. 1881, 87th Cong., 2d Sess. 47–48 (1962), 1962–3 C.B. 753. The regulations define "amount realized" as used in section 595 to mean "an amount representing a recovery of capital, such as proceeds from the sale or other disposition of the property, payments on the original indebtedness made by or on behalf of the debtor" (including amounts received under Federal Housing Administration insurance contracts and Veterans' Administration guarantees), and collections on deficiency judgments obtained against the debtor. Sec. 1.595–1(e)(6), Income Tax Regs. Thus, as used in section 595, the term means the amount obtained by the lending association on the foreclosure and disposition of the security property which is available for application on the borrower's indebtedness. Such amount can be computed only by taking into account the selling expenses as well as the acquisition expenses.

From the standpoint of a foreclosing loan association attempting to collect a debt which has gone bad, the expenses of selling the foreclosed property are as much a part of the cost thereof as the expense of acquiring title to it.[11] The proceeds of the sale used to offset one such set of expenses represent the "recovery of capital," sec. 1.595–1(e)(6), Income Tax Regs., as much as the other. In *Woodward v. Commissioner*, 397 U.S. 572, 576 (1970), dealing with whether litigation expenses with respect to a capital asset should be

---

amount of the liability, shall be treated as money received by the taxpayer in computing the "amount realized."

[11] Costs of the foreclosure are added to the property's basis under sec. 1.595–1(d), Income Tax Regs., as follows:

(d) *Basis of acquired property.* Section 595(c) provides that the basis of any property to which section 595(a) applies (hereinafter referred to as "acquired property") shall be the adjusted basis of the indebtedness for which such property was security, determined as of the date of acquisition of such property, properly increased for costs of acquisition. The date of acquisition is the date, determined under paragraph (b) of this section, on which the security property is reduced to ownership or possession by agreement or process of law. Costs of acquisition are expenditures incurred by the creditor (for example, fees for an attorney, master, trustee, auctioneer, for publication, acquiring title, clearing liens, filing and recording, and court costs) which are directly related to the foreclosure sale or proceeding, or to the other process used to reduce the security property to ownership or possession, or both, by agreement or process of law. * * *

capitalized or deducted, the Supreme Court observed that "such ancillary expenses [legal, brokerage, accounting, and/or similar costs] incurred in acquiring *or disposing* of an asset are as much part of the cost of that asset as is the price paid for it [emphasis added]." "[W]e cannot see why the order in which these operations occurred * * * should make any difference in the characterization of the expenses." *United States v. Hilton Hotels Corp.*, 397 U.S. 580, 584 (1970).[12] Both sets of expenses must be paid before the lending institution can realize anything for application on the defaulted debt. The property may be a capital asset or may be held primarily for sale, but the expenses of selling the foreclosed property are inherently capital in nature.

To avoid the impact of this reasoning, petitioner emphasizes that its foreclosures were "regular," "systematic," "ordinary," and "necessary" and argues that, therefore, its selling expenses are deductible under section 162(a). Implicit in this argument is a concession that, where the foreclosed property is a capital asset in the hands of the lending institution, the selling expenses must be capitalized. But adoption of this position would require a determination of the character of the business activities of the lending institution and would thus reopen an issue which section 595 was intended to set at rest.

Prior to the enactment of section 595, there was confusion as to whether property foreclosed by savings and loan associations should be treated as capital assets, property held primarily for resale, or property used in the taxpayer's business within the meaning of section 1231.[13] The committee

---

[12] Employing the same reasoning nearly all of the Circuit Courts of Appeals have held that real estate brokerage commissions and related expenses incurred in a sec. 337 liquidation are offset against the selling price and are not deductible currently as ordinary and necessary expenses. *Page v. Commissioner*, 524 F.2d 1149 (9th Cir. 1975), affg. a Memorandum Opinion of this Court; *Of Course, Inc. v. Commissioner*, 499 F.2d 754 (4th Cir. 1974); *Connery v. United States*, 460 F.2d 1130 (3d Cir. 1972); *Lanrao, Inc. v. United States*, 422 F.2d 481 (6th Cir. 1970); *United States v. Morton*, 387 F.2d 441 (8th Cir. 1968); *Alphaco, Inc. v. Nelson*, 385 F.2d 244 (7th Cir. 1967).

[13] In G.C.M. 21497, 1939–2 C.B. 187, the Internal Revenue Service (IRS) ruled that property foreclosed and offered for sale by a savings and loan institution or bank was property held primarily for sale to customers in the ordinary course of business and the resulting gain or loss was ordinary in character. In *Kanawha Valley Bank v. Commissioner*, 4 T.C. 252 (1944), this Court ruled that property foreclosed by a bank, forbidden by State law to carry on a real estate business, was a capital asset. Because of this decision, in G.C.M. 24910, 1946–1 C.B. 101, the IRS ruled that property foreclosed and sold was a capital asset. But see *Girard Trust Corn Exchange Bank v.*

report accompanying the enactment of section 595 (S. Rept. 1881, 87th Cong., 2d Sess. 47–48 (1962), 1962–3 C.B. 753–754, explains:

Under existing law the foreclosure event is considered a taxable transaction. This has been interpreted to mean that a bad-debt deduction may or may not arise at that time, depending upon the relation of the bid price of the property to the amount of the loan outstanding. Where the foreclosed property is bid in for the amount of the loan a bad debt deduction may not be taken under present law; however, a gain or loss may result at the time of foreclosure if the fair market value of property foreclosed is different from the price at which it was bid in. When the property is subsequently sold by the mutual savings institution, it may realize a further gain or loss on such disposition. Whether the gains and losses at the time of foreclosure and at the time of ultimate disposition are capital or ordinary gains and losses *depends on the nature of the activities of the institution at each such time.*

The bill seeks to avoid these *erratic results* by providing that in the future a foreclosure is not to be treated as a taxable event, and that amounts received by the mutual savings institution subsequent to the foreclosure are to be treated as payments on the indebtedness. This would be accomplished under the bill by treating the property received in a foreclosure (or other proceeding) as having the same characteristics as the debt for which it was security. Thus, for bad-debt (or loss) purposes the act of foreclosure will not create a taxable occasion; * * *

[Emphasis added.]·

The difference between the amount received and the original or previously reduced debt is to be treated as ordinary loss or income and is to be charged, or credited, as the case may be, against the reserve for losses on qualifying real property loans. Since petitioner's position would require a finding on the "nature of the activities" of the lending institution at the time of the sale, it would frustrate this declared purpose to avoid the "erratic results" of making each case depend on its individual facts. It would ignore the express provision of section 595(b) that "For purposes of sections 166 and 1221" such foreclosed property "shall be considered as property having the same characteristics as the indebtedness" it secured.

Moreover, petitioner in effect concedes that "amount realized" does not always mean gross sales proceeds. When

---

*Commissioner,* 22 T.C. 1343 (1954). Subsequently, in G.C.M. 26690, 1951–1 C.B. 28, the IRS ruled that such property was used in the taxpayer's trade or business. Under that ruling, the property was depreciable and, if it were sold at a gain, the income would be capital gain and, if sold at a loss, would be ordinary loss.

the foreclosing lending institution under State law is accountable to the borrower for receipts and the borrower is accountable for expenses, petitioner concedes that selling and other expenses are not deductible but, instead, increase the savings and loan association's basis in the foreclosed property and ultimately are credited to the reserve for losses on qualified loans. Yet in most instances, unless the gain on the foreclosure exceeds the amount of the debt, the net amount ultimately received and applied on the borrower's debt is the same, whether or not the borrower and lender are separately accountable for specific expenses. In that event, the entire gain on the sale is applied on the debt. There is nothing in the language of section 593 or 595 or their legislative history even suggesting that Congress intended to make the issue as to whether selling expenses should be credited or charged to the reserve account or deducted under section 162(a) turn on State law.

To buttress this "accountability" argument, however, petitioner focuses on section 1.595–1(e)(7) and (8), Income Tax Regs. Petitioner interprets these regulations to allow a deduction for all postforeclosure expenses, including selling commissions and expenses, where under State law the borrower in default is not accountable to the creditor for such expenditures. As we view those regulations, however, such an interpretation is erroneous.

The specific language relied on by petitioner is found in section 1.595–1(e)(7), Income Tax Regs., which in pertinent part provides as follows:

Section 595 does not change the treatment of rents, royalties, dividends, interest, or similar amounts received or accrued by the creditor with respect to acquired property, nor does it change the treatment of expenses incurred with respect to such property.

Petitioner points to examples (1) and (2) of section 1.595–1(e)(8), Income Tax Regs.,[14] which explain the treatment to be

---

[14] Sec. 1.595–1(e)(8), Income Tax Regs., provides as follows:

(8) *Examples.* The provisions of subparagraphs (6) and (7) of this paragraph may be illustrated by the following examples:

*Example (1)*—(i) *Facts.* X Corporation, a creditor which is an organization described in section 593(a), uses the reserve method of accounting for bad debts. On May 1, 1964, X reduces to ownership or possession by agreement or process of law improved real property which is security for an indebtedness of A which is in default. On the date of acquisition there remains unpaid on the indebtedness $20,000 principal and $700 interest. X has previously included the $700 interest in gross income.

Subsequent to acquisition, X incurs expenses totaling $500 for maintenance, and during the period June 1 through September 30, 1964, rents the property for a total rental of $400. Under local law, X is accountable to A for the rents received and A is accountable to X for the expenses incurred. There are no other receipts or expenses until October 1, 1964, at which time X sells the acquired property for $22,000. Under local law, A is not entitled to any portion of the sales proceeds.

(ii) *Treatment of rents, expenses, and sales proceeds.* X would treat rents, expenses, and sales proceeds in the following manner:

| | |
|---|---:|
| Basis of acquired property at acquisition (adjusted basis of indebtedness, i.e., $20,000 principal plus $700 interest)... | $20,700 |
| Plus: Expenses charged to debtor ............................................. | 500 |
| | 21,200 |
| Less: Rents credited to debtor................................................... | 400 |
| Adjusted basis of acquired property at sale........................... | 20,800 |
| Less: Portion of $22,000 sales proceeds applied in reduction of adjusted basis of acquired property ............... | 20,800 |
| | 0 |
| Portion of sales proceeds credited to reserve for losses on qualifying real property loans ($22,000 minus $20,800)... | 1,200 |

(iii) *Creditor using specific deduction method.* If instead of using the reserve method of accounting for bad debts X used the specific deduction method, the $1,200 portion of the sales proceeds would be treated as ordinary income.

*Example (2)*—(i) *Facts.* The facts are the same as in example (1) except that under local law X is not accountable to A for any portion of the rents received and A is not accountable to X for the expenses incurred by X.

(ii) *Treatment of rents and expenses.* X includes in gross income the total rent receipts of $400 and deducts (if otherwise allowable) the expenses of $500.

(iii) *Treatment of sales proceeds.* As the result of the sale of the acquired property, X credits $1,300 to the reserve for losses on qualifying real property loans, computed as follows:

| | |
|---|---:|
| Basis of acquired property at acquisition and at date of sale (adjusted basis of indebtedness, i.e., $20,000 principal plus $700 interest) ................................................. | $20,700 |
| Less: Portion of $22,000 sales proceeds applied in reduction of adjusted basis of acquired property ............... | 20,700 |
| | 0 |
| Portion of sales proceeds credited to reserve for losses on qualifying real property loans ($22,000 minus $20,700)... | 1,300 |

(iv) *Creditor using specific deduction method.* If instead of using the reserve method of accounting for bad debts X used the specific deduction method, the $1,300 portion of the sales proceeds would be treated as ordinary income.

*Example (3)*—(i) *Facts.* The facts are the same in example (1) except that X sells the acquired property for $15,000.

(ii) *Treatment of rents, expenses, and sales proceeds.* X would treat rents, expenses, and sales proceeds in the following manner:

| | |
|---|---:|
| Basis of acquired property at acquisition (adjusted basis of indebtedness, i.e., $20,000 principal plus $700 interest)... | $20,700 |
| Plus: Expenses charged to debtor ............................................. | 500 |
| | 21,200 |
| Less: Rents credited to debtor................................................... | 400 |
| Adjusted basis of acquired property at sale........................... | 20,800 |
| Less: Portion of $15,000 sales proceeds applied in reduction of adjusted basis of acquired property ............... | 15,000 |
| Amount charged to reserve for losses on qualifying real property loans......................................................................... | 5,800 |

accorded items of income received by, and expenses incurred by, a creditor during the interim period between the foreclosure and the sale of the property. Those examples, however, deal only with costs of maintaining property held by the creditor while it is rented, and nothing in the language of the examples outlines the treatment of selling expenses and commissions. When viewing the language of section 1.595–1(e)(7), Income Tax Regs., and the examples outlined in section 1.595–1(e)(8), Income Tax Regs., the only logical premise which can be drawn is that items of income and expenses generated by income-producing property must be allocated according to accountability for such items under State law. They do not purport to deal with expenses incurred in selling the foreclosed property.

The only provisions in section 595 and its accompanying regulations, dealing with costs similar to those in issue, are found in section 595(c) and section 1.595–1(d), Income Tax Regs. Section 595(c) states that the basis of foreclosed property in the hands of the creditor shall be the basis of the secured indebtedness, properly increased for the cost of acquisition. Such costs of acquisition are described in section 1.595–1(d), Income Tax Regs., as follows:

expenditures incurred by the creditor (for example, fees for an attorney, master, trustee, auctioneer, for publication, acquiring title, clearing liens, filing and recording, and court costs) * * *

These costs of acquisition are virtually identical to the selling commissions and expenses here at issue, and in our view, it would be an unwarranted inconsistency to apply such costs on the acquisition of property to the reserve for losses on qualifying real property loans but to deduct under section 162(a) the same type of expenditures on the subsequent resale of the same property.

In summary, we conclude the following:

(1) Commissions and other selling expenses[15] are not deductible under section 162 as ordinary and necessary expenses of petitioner's business.

---

(iii) *Creditor using specific deduction method.* If instead of using the reserve method of accounting for bad debts X used the specific deduction method, the excess of $5,800 would be allowed as a specific bad debt deduction.

[15] Indirect expenses, such as the salaries, office, and other related expenses of savings and loan association personnel handling foreclosures, are, of course,

(2) Commissions and other selling expenses must be accounted for through appropriate charges or credits to petitioner's reserve for losses on qualifying real property loans as provided in section 595(b) and its supporting regulations.[16]

To reflect the foregoing,

*Decision will be entered under Rule 155.*

---

deductible under sec. 162(a). Those expenses are not related to any specific property and in no circumstances would be deductible under sec. 166 as additions to bad debt reserves.

[16] Attached to the petition is a copy of a technical advice memorandum dated Dec. 28, 1971, concluding the expenses here in issue are deductible under sec. 162(a) as well as a copy of a technical advice memorandum, dated Jan. 12, 1973, and Rev. Rul. 73–116, 1973–1 C.B. 300, reaching a contrary conclusion. The petition alleges respondent is estopped by the first of the two memoranda to deny the disputed deductions. Petitioner has not briefed its estoppel allegation and we treat it as abandoned. See *Automobile Club v. Commissioner,* 353 U.S. 180 (1957). In reaching the foregoing conclusion, we have proceeded on the principle that "Congress, not the Commissioner, prescribes the tax laws." *Dixon v. United States,* 381 U.S. 68, 73 (1965).