**GIBRALTAR FINANCIAL CORPORATION OF CALIFORNIA, et al., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 21–82T, 22–82T.**

United States Claims Court.

May 9, 1986.

Martin S. Schwartz, Los Angeles, Cal., for plaintiff. McKenna, Conner & Cuneo, Los Angeles, Cal., of counsel.

Mildred L. Seidman, Washington, D.C., with whom was Acting Asst. Atty. Gen. Roger M. Olsen, for defendant. Jonathan S. Cohen and Karlyn D. Stanley, Washington, D.C., of counsel.

### OPINION

MAYER, Judge.

Plaintiff Gibraltar Financial Corporation (GFC), seeks a tax refund because the In-

---

ternal Revenue Service (Service) improperly included amounts attributed to uncollected delinquent interest on defaulted real property loans in its gross income for 1972 and 1973. In plaintiff's view, these amounts, realized from the resale of properties securing defaulted loans, should be credited to its bad debt reserve account under section 595 of the Internal Revenue Code of 1954, 26 U.S.C. § 595. The case is here on cross-motions for summary judgment. The material facts are stipulated and disposition by summary judgment is appropriate.

### Background

During calendar years 1972 and 1973, plaintiff owned substantially all of the issued and outstanding capital stock of Gibraltar Savings and Loan Association (Gibraltar), a California corporation licensed to conduct business as a savings and loan association under California law. Plaintiff keeps its books, files, and federal income tax returns on a calendar year basis. For 1972 and 1973, GFC, Gibraltar, and certain other affiliated corporations constituted an affiliated group within the meaning of 26 U.S.C. § 1504, and reported income on consolidated returns.

Gibraltar attracts savings deposits primarily from the general public and lends money secured by interests in real property. The real property loans consist of a promissory note secured by a first deed of trust on residential real property being purchased by the borrower. The trust deeds contain a power of sale provision authorizing the named trustee to sell the security property upon default by the borrower at a public trustee's sale without resort to judicial proceedings. Gibraltar is subject to examination and regulation by the Federal Home Loan Bank Board.

Gibraltar qualifies as "a domestic building and loan association" under 26 U.S.C. § 593(a) for purposes of section 595(a). During the years in question, it computed its taxable income under the cash receipts and disbursement method as permitted by section 446(c)(1), and used the reserve method for deducting bad debts.

Gibraltar computed additions to its bad debt reserve by using the percentage of taxable income method prescribed in section 593(b)(2). By this method, a savings and loan institution computes additions to its bad debt reserve based on a percentage of its taxable income, including interest income. These additions cannot be made after the credit balances in the bad debt reserve exceed designated maximum amounts. 26 U.S.C. §§ 593(b)(1)(B), (b)(2)(D).

During 1972 and 1973, Gibraltar "reduced to ownership or possession by agreement or process of law," within the meaning of section 595(a), sixty single family residential properties, each having served as the security for loans to borrowers purchasing these properties. At the time of each foreclosure, uncollected delinquent interest had accrued.

After adjusting the basis in each foreclosed property to reflect its cost of acquisition and capital improvements, Gibraltar sold them during 1972–73 to unrelated third parties. Purchasers either paid the full sale price or made a cash down payment with the balance payable over a term of years at a designated interest rate. Where Gibraltar financing was used, the obligation to pay the balance of the purchase price was secured by a first trust deed in favor of Gibraltar. The proceeds received by Gibraltar upon the disposition of each of the sixty foreclosed properties exceeded its adjusted tax basis in each property. The amounts realized did not include a specified amount for accrued but uncollected interest. Using its contested interpretation of section 595, plaintiff credited all the proceeds received for these resold foreclosed properties to its bad debt reserve.

The Service assessed deficiencies after audits of plaintiff's consolidated income tax returns for the years 1972 and 1973. In light of Rev.Rul. 75–251, 1975–1 C.B. 775, defendant contends that any amounts received in excess of basis are attributable to charged but uncollected interest and must

be recognized as ordinary income by a cash basis taxpayer.

### Discussion

"Prior to 1952, domestic building and loan associations [savings and loans] were exempt from Federal income tax. The Revenue Act of 1951 subjected them to a regular corporate income tax but allowed a special deduction for additions to bad debt reserves." *Allstate Savings and Loan Association v. Commissioner,* 68 T.C. 310, 314 (1977), *aff'd,* 600 F.2d 760 (9th Cir. 1979). Under the 1951 law, a mortgage foreclosure and subsequent sale by a savings and loan resulted in three tax consequences governed primarily by Treas.Reg. § 1.166-6. First, section 1.166-6(a)(1) permitted a bad debt deduction measured by the difference between the bid price offered by the mortgagee and the basis of the debt, including foreclosure costs. Second, foreclosure also required recognition of gain or loss measured by the difference between the fair market value of the property at the time of the transaction and the amount of debt obligation "applied to the purchase or bid price of the property...." Treas.Reg. § 1.166-6(b)(1).

The mortgagee was also able to postpone the realization of foreclosure gain by relying on section 1.166-6(b)(2) of the regulations. In that event, the fair market value of the property was presumed to be the amount for which it was bid in by the mortgagee. *See Community Bank v. Commissioner,* 62 T.C. 503, 507 (1974).

If the bad debt deduction was not offset by a taxable gain at the time of foreclosure, it might be so offset at the time of the subsequent sale of the property, a third tax consequence. Gain or loss on the sale was predicated upon the fair market value of the property at the time it was acquired by the mortgagee. Treas.Reg. § 1.166-6(c). Whether the loss or gain realized at foreclosure or at the subsequent sale was ordinary or capital depended on the nature of the business activities of the mortgagee at that time. S.Rep. No. 1881, 87th Cong., 2d Sess. 47 (1962), U.S.Code Cong. & Ad-min.News 1962, p. 3297, 1962-3 C.B. 703, 753.

The results of this scheme were erratic, especially the discrepency between the bid price and the basis of the debt, and the variable tax outcomes that could occur over the span between foreclosure and sale. *See* S.Rep. No. 1881, *supra,* at 47–48, 1962-3 C.B. 753–54; H.R.Rep. No. 1447, 87th Cong., 2d Sess. 36–37 (1962), 1962-3 C.B. 403, 440–41. In fact, "this special [bad debt] deduction proved to be so large that such organizations remained virtually tax exempt until the Revenue Act of 1962 [Pub.L. 87–834, 76 Stat. 960 (1962)] added sections 593 and 595 to the 1954 Code." *Allstate Savings & Loan Association v. Commissioner,* 68 T.C. at 314. *See* H.R. Rep. 1447, *supra,* at 32, 1962-3 C.B. 436.

Section 593 specifies the organizations subject to the 1962 legislation and how additions to the bad debt reserve are to be calculated. Section 595 collapses the two transactions of foreclosure and sale of the security property by the mortgagee and the accompanying multiple tax consequences into one event. It defers adjustments to the bad debt reserve or any recognition of loss or gain until the ultimate disposition of the property. Loss or gain recognized upon final disposition is denied capital treatment and no depreciation allowance on the property may be taken while the mortgagee retains title. *See* S.Rep. No. 1881, *supra,* at 47–48, 1962-3 C.B. 753–54. This major legislative revision subjected these organizations to heavier income taxes. *See First Federal Savings & Loan Association of Bristol v. United States,* 660 F.2d 767, 768, 228 Ct.Cl. 569 (1981); *Allstate Savings and Loan Association,* 68 T.C. at 314.

■ Section 595(b) says,

*Character of property.*—For purposes of sections 166 and 1221, any property acquired in a transaction with respect to which gain or loss to an organization was not recognized by reason of subsection (a) shall be considered as property having the same characteristics as the indebtedness for which such property was securi-

ty. Any amount realized by such organization with respect to such property shall be treated for purposes of this chapter as a payment on account of such indebtedness, and any loss with respect thereto shall be treated as a bad debt to which the provisions of section 166 (relating to allowance of a deduction for bad debts) apply.

Defendant would limit the "amount realized" that is credited to the bad debt reserve under section 593 to the recovery of basis. Any excess over basis would be attributed to accrued but uncollected interest and recognized as ordinary income under sections 61(a) and 64. Defendant relies on Rev.Rul. 75–251, 1975–1, C.B. 175, and Treas.Reg. § 1.595–1(e)(6). The revenue ruling emphasizes that the regulation defines "amount realized" as a recovery of capital. "Interest received by a taxpayer in conjunction with a foreclosure proceeding is not a recovery of capital." Defendant also relies on *First Charter Financial Corp. v. United States*, 669 F.2d 1342 (9th Cir.1982), which accepted its position here.

Plaintiff challenges Rev.Rul. 75–251, claiming that section 595(b) authorizes a credit of all realized proceeds to its bad debt reserve account. The revenue ruling and inconsistent regulations must give way to the plain and ordinary meaning of the statute. Plaintiff relies principally on *First Federal Savings and Loan Association of Bristol v. United States*, 660 F.2d 767.

*Bristol* held that "[t]he language of [section 595(b)] is extremely broad. It provides that '[a]ny amount realized ... with respect to' the foreclosed property should be treated as a payment on account of the indebtedness. It is not limited, as the defendant and the regulation upon which it relies [Treas.Reg. 1.595–1(e)(6)] would restrict it to 'an amount representing a recovery of capital.' " 660 F.2d at 769.[1]

Defendant is correct that *Bristol* addresses the income tax treatment of rents received by a creditor after taking posses-

sion through a private foreclosure, while we are concerned with the tax treatment of delinquent interest. But the same statutory language characterizing proceeds "realized ... with respect to" foreclosed property is at issue here. The interpretation given by *Bristol* controls this court's analysis. The meaning of the phrase "any amount realized" cannot vary depending on the source or timing of the proceeds received.

The contrary outcome of *First Charter Financial Corp. v. United States*, 669 F.2d 1342, factually similar to our case and which defendant espouses, is not persuasive. In endorsing defendant's position that amounts realized by a cash basis savings and loan in excess of adjusted basis are to be recognized as current interest income to the extent of delinquent interest, rather than as a credit to the bad debt reserve, the Ninth Circuit sought to distinguish *Bristol*. The court thought it significant that the Court of Claims was troubled by an interpretation which would treat rental income received during the period between foreclosure and sale as ordinary income but would not permit the traditional depreciation deduction. In contrast, *First Charter* dealt with accrued interest. It observed that the general rule is that interest is ordinary income, and there is no indication that Congress intended a different rule in this context. *Id.* at 1349. The purported distinction fails, however, because *Bristol* turned not on the anomaly avoided, but on the "plain meaning of the statute." 600 F.2d at 770. The Court of Claims applied the statute as Congress wrote it.

The Ninth Circuit thought its interpretation would equalize the treatment of cash and accrual basis institutions. But there is no warrant to disregard plain statutory language to provide supposedly equal treatment for different methods of accounting. It is not unusual for significant tax consequences, both positive and negative, to turn on the method of accounting chosen. If

---

1. *Bristol* rejected the purported restriction in Treas.Reg. § 1.595–1(e)(6) in the course of its discussion of section 1.595–1(e)(7), the provision at issue there.

Congress has not eliminated tax discrepancies between cash and accrual methods, defendant may do so only through statutory modification.

In point of fact, an accrual basis taxpayer may well have stopped accruing interest before foreclosure. Regulations of the Federal Home Loan Bank Board then in effect required a savings and loan institution to stop accruing interest and treat it as uncollectible after ninety days of delinquency. 12 C.F.R. § 572.2 (1972).[2] In those circumstances an accrual basis taxpayer need not continue to accrue interest for tax purposes. *See* Rev.Rul. 81–18, 1981–1 C.B. 295. To the extent an accrual basis institution did stop accruing unpaid interest, it would be treated more favorably than a cash basis institution under Rev.Rul. 75–251, because there would be no interest to be deemed recovered on the resale of the property. *See* Peat, Marwick, Mitchell & Co., 1 *Taxation of Financial Institutions,* § 17.06[2] at 17–8 (1983).

*First Charter* itself would cause cash and accrual basis taxpayers to be treated differently because it would permit those on a cash basis to defer recognition of income until disposal of the foreclosed property while those on the accrual basis would recognize interest income as it accrued. So the ostensible practical reasons for avoiding the clear language of the statute turn out to be problematical.

*First Charter's* failure to apply the statute as written also produces other inequities. It requires amounts that would otherwise have been deductible to be handled through the bad debt reserve, but requires a purported interest element, on the income side, to be taken into income currently. For example, in *Allstate Savings and Loan Association v. Commissioner,* 68 T.C. 310 (1977), *aff'd,* 600 F.2d 760 (9th Cir.1979), a savings and loan was required

to charge its bad debt reserve for broker commissions and other expenses attendant upon selling foreclosed properties. These expenses would normally be deductible as ordinary and necessary business expenses. The Tax Court and Ninth Circuit agreed with defendant "that the most reasonable interpretation of [section 595(b)] is that all the tax results of foreclosures, including the expense of disposing of the foreclosed property, are to be accounted for through adjustments to the association's reserve for losses from qualifying loans." 68 T.C. at 316. *First Charter's* attempt to rationalize *Allstate* as addressing inherently capital expenses rather than interest which is ordinarily income, 669 F.2d at 1349, is not persuasive in light of the statute. *See Bristol,* 660 F.2d at 769.

To further buttress its construction of "amount realized" defendant cites taxpayers other than those qualifying under section 593(a), who must recognize interest as ordinary income under sections 61(a)(4) and 64. It argues there is no logical reason not to require a cash basis mortgagee to recognize delinquent interest as taxable income in the year of its recovery. Because Congress was silent on this specific item, defendant should be free to exercise its discretion to make section 595 consistent with sections 61(a) and 64 by regulation.

Whatever other income recognition situations exist, they are not at issue here. Sections 61(a) and 64 notwithstanding, Rev. Rul. 73–116, 1973–1 C.B. 300, 301, says that section 595 "is the exclusive provision governing the Federal income tax consequences of foreclosures on mortgages by such organizations."

Furthermore, while it is often perilous to advert to legislative history, *Speco Corp. v. United States,* 2 Cl.Ct. 335, 337 (1983), one statement of congressional intent appears to be uncontradicted. "When the property

---

**2.** In 1983, the Board amended this regulation. 12 C.F.R. § 563. c. 11. Accrual basis institutions may have to recognize interest income beyond the ninety-day period. Loans are no longer presumed to be worthless for purposes of section 166 because they are ninety days delinquent. However, the amendment changes only

the degree of disparity in tax treatment between accrual and cash basis savings and loans. Accrual basis institutions would still have the advantage under Rev.Rul. 75–251. *See* Peat, Marwick, Mitchell & Co., 1 *Taxation of Financial Institutions,* § 17.06[2], at 17–10 (1983).

is ultimately sold or disposed of, the difference between *any* amount realized and the original or previously reduced debt, is to be treated as ordinary loss or income and is to be charged, or credited, as the case may be, against the reserve for losses on qualifying real property loans." S.Rep. No. 1881, *supra,* at 48, U.S.Code Cong. & Admin.News 1962, at 3350, 1962–3 C.B. 754 (emphasis added); H.R.Rep. No. 1447, *supra,* at 37, 1962–3 C.B. 441. This supports the plain wording of the statute. If Congress had intended to delineate a portion of the sale proceeds as an amount not to be credited to the bad debt reserve, it could have done so. Defendant's exercise of discretion to correct a perceived omission is unauthorized. *Caterpillar Tractor Co. v. United States,* 589 F.2d 1040, 1045, 218 Ct.Cl. 517 (1978).

Defendant observes that prior to the enactment of sections 593 and 595, a cash basis mortgagee had to recognize accrued but unpaid interest as taxable if it bought the mortgaged property at a foreclosure sale by bidding an amount equal to the sum of the unpaid principal and the accrued delinquent interest. *Helvering v. Midland Life Insurance Co.,* 300 U.S. 216, 224, 57 S.Ct. 423, 426, 81 L.Ed. 612 (1937); *General Southern Life Insurance Co. v. Commissioner,* 89 F.2d 54, 56 (5th Cir.1937). Even if the fair market value of the property is less than the bid price, income is recognized if the bid price reflects accrued delinquent interest. *Midland,* 300 U.S. at 223, 57 S.Ct. at 425.

Defendant also points to cases holding that a cash basis mortgagee had to recognize interest income for taking a deed in lieu of foreclosure where the fair market value of the property exceeded the basis of the debt, plus costs. *Helvering v. Missouri State Life Insurance Co.,* 78 F.2d 778, 780 (8th Cir.1934); *Manufacturers Life Insurance Co. v. Commissioner,* 43 B.T.A. 867, 873 (1941). The mortgagor in these situations would also be entitled to a concurrent deduction for interest paid to the

extent it was a component of the bid price. 300 U.S. at 224, 57 S.Ct. at 426.

None of this is applicable here. Before the 1962 legislation, the foreclosure process was separated into multiple tax recognition events and the fair market value of the security property affected the tax consequences of each event. It was reasonable to give an interest deduction to the debtor if the creditor recognized income when he purchased the security property and extinguished all or part of the outstanding debt.

Sections 593 and 595, however, drastically modified the bad debt reserve provisions by collapsing the foreclosure process into a single taxable transaction and ignoring, for the most part, consideration of the fair market value of the property.[3] *See Allstate Savings and Loan Association,* 68 T.C. at 317. "[T]he tax consequences of that single event [are] determined not by reporting the gain or loss on the sale of the foreclosed property, as such, but through a credit or charge to the reserve for losses on qualifying real property loans. If the amounts received from the sale of the property are less than the unpaid indebtedness, a charge will be made to the reserve account. If such amounts exceed the indebtedness, a credit is made to that account." *Id.* See also S.Rep. 1881, *supra,* at 47, U.S.Code Cong. & Admin.News 1962, at 3350, 1962–3 C.B. 753.

The ordinary income recognition and interest deduction called for in *Midland* and *General Southern* are inapplicable because the purchase of the security property is no longer a separate taxable event. Congress has restructured the tax aspects of foreclosures for savings and loans and courts should give them full effect. *See United States v. Gilmore,* 372 U.S. 39, 48, 83 S.Ct. 623, 628–29, 9 L.Ed.2d 570 (1963).

■ There is also disagreement over the meaning of the sentence, "For purposes of section 166 and 1221, any property ac-

---

**3.** The fair market value of the security property has impact on the bad debt provisions if the property actually declines in value below the taxpayer's adjusted basis in it, and the creditor

can establish that the difference is uncollectible on the indebtedness. The creditor may then take a deduction through section 166. Treas. Reg. § 1.595–1(e)(1).

quired ... shall be considered as property having the same characteristics as the indebtedness for which such property was security." 26 U.S.C. § 595(b). Defendant says it means the security property taken by the creditor in foreclosure retains the separate principal and interest components of the promissory debt throughout the foreclosure process. *See* Rev.Rul. 75–251. Any proceeds from the sale of the foreclosed property reflect principal and interest, the latter to the extent that the proceeds exceed the taxpayer's adjusted basis in the property. *Id.* Any interest recognized from these sale proceeds must be recognized as ordinary income. *See* 26 U.S.C. §§ 61(a), 64.

Plaintiff's response, with which the court agrees, is that the property retains the characteristics of the underlying debt only for the purposes of sections 166 and 1221, not for all purposes. The reference to section 1221 shows that Congress disallowed the pre-1962 capital gain or loss treatment to sales proceeds that contributed to the erratic tax results of foreclosure. It wants to treat the proceeds as ordinary loss or income to be charged or credited to the savings and loan's bad debt reserve.[4] S.Rep. No. 1881, *supra,* at 47–48, 1962–3 C.B. 753–54. The statutory reference to section 166 means that "no deduction for exhaustion, wear and tear, obsolescence, amortization, or depletion shall be allowed to a creditor with respect to acquired property." Treas.Reg. 1.595–1(e)(1); *see also* S.Rep. No. 1881, *supra,* at 47–48, 1962–3 C.B. 753–54. Section 593 taxpayers may not use other tax reduction provisions in addition to the bad debt procedures. The references to sections 166 and 1221 are specific and unambiguous. They suggest no "interest" or "principal" components of the proceeds.

The court has, as it must, considered any reasonable basis on which the regulation and revenue ruling might be sustained. *Sullivan v. United States,* 4 Cl.Ct. 70, 73 (1983), *aff'd,* 742 F.2d 628 (Fed.Cir.1984); *Mourning v. Family Publications Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973). But, "if the statute is unambiguous on its face, there is no room for Treasury interpretation." *Caterpillar Tractor Co. v. United States,* 589 F.2d 1040, 1045, 218 Ct.Cl. 517 (1978). *See also Koshland v. Helvering,* 298 U.S. 441, 447, 56 S.Ct. 767, 770, 80 L.Ed. 1268 (1936). "The court concurs in the proposition that the long-standing consistent interpretation of a statute manifested by regulations promulgated by the agency charged with implementing it is due significant deference. But this axiom is tempered by the admonition that a regulation which is clearly incompatible with the statute under which it was ostensibly promulgated must give way." *Sullivan v. United States,* 4 Cl.Ct. at 73 (citations omitted). Section 595(b) is not ambiguous. To the extent they derogate from the statute, Rev.Rul. 75–251 and Treas.Reg. § 1.595–1(e)(6) cannot be sustained.

### Conclusion

Accordingly, it is ORDERED that plaintiff's motion for summary judgment is GRANTED and defendant's cross-motion for summary judgment is DENIED. Within 30 days, the parties will file a stipulation setting out the amount of refund plaintiff is due, upon which the Clerk will enter judgment. Plaintiff will have its costs.

---

4. The Senate Report says, "When the property is ultimately sold or disposed of, the difference between any amount realized and the original or previously reduced debt, is to be treated as ordinary loss or income *and* is to be charged, or credited, as the case may be, against the reserve for losses on qualifying real property loans." S.Rep. No. 1881, 87th Cong., 2d Sess. 48 (1962), U.S.Code Cong. & Admin.News 1962, p. 3350, 1962–3 C.B. 703, 754 (emphasis added). How-

ever, the parties agree that use of the conjunctive was unintended; the disjunctive "or" must be substituted to avoid a nonsensical result. Upon the property's final disposition, the mortgagee may either take a bad debt deduction or recognize ordinary gain, Treas.Reg. § 1.166–1(a)(1), or charge or credit its bad debt reserve, Treas.Reg. § 1.166–1(a)(2), depending on which method it has elected under the regulations. It may not do both.