FIRST FEDERAL SAVINGS AND LOAN
ASSOCIATION OF BRISTOL

v.

The UNITED STATES.

No. 147–79T.

United States Court of Claims.

Sept. 23, 1981.

John Y. Merrell, McLean, Va., Atty. of record, for plaintiff; John Y. Merrell, Jr. and Timothy J. Callahan, McLean, Va., of counsel.

Israel D. Shetreat, Washington, D. C., with whom was Acting Asst. Atty. Gen., John F. Murray, Washington, D. C., for defendant; Theodore D. Peyser and Donald H. Olson, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, and NICHOLS and KUNZIG, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S CROSS–MOTION FOR SUMMARY JUDGMENT

NICHOLS, Judge.

This is a suit by a savings and loan association described in Section 593 of the Internal Revenue Code of 1954, to recover overpayment of income taxes for 1975 and 1976, resulting from inclusion in income of rentals on foreclosed property, as required by defendant. The issue is the proper interpretation of § 595 of the Code and the validity of a Treasury Regulation founded on § 595. There is no triable issue of fact. We hold for the plaintiff for reasons to be stated.

Plaintiff, First Federal Savings and Loan Association of Bristol (S & L) is in the business its name implies. It is limited by its charter to making loans secured by real estate, and it is subject to examination and regulation by the Federal Home Loan Bank Board. It is an accrual basis taxpayer and its fiscal year for tax purposes is its calendar year. In spring 1972 it agreed to make and did make a secured construction loan to Downtown Plaza, Inc., to be used to build an apartment complex of seven buildings in Bristol, Virginia. A note of May 1, 1972, was secured by a deed of trust covering the site and the anticipated improvements. In Virginia, a deed of trust is tantamount to what is more generally called a mortgage. The borrower was early in difficulties, but S & L, reluctant to foreclose an unfinished property, carried the loan until February 7, 1974, then foreclosing. It purchased the property itself for $710,000 at the sale, being the only bidder. At that time plaintiff had disbursed $982,000 on the loan. Four buildings and 48 rental units were then completed. Plaintiff rented them, while working to complete the other three buildings and 28 units. It collected rents, incurred expenses related to the rental property (exclusive of depreciation) and profited as follows:

| YEAR | RENTALS RECEIVED | RENTAL EXPENSES | PROFIT |
|------|------------------|-----------------|--------|
| 1975 | $71,274 | $34,046 | $37,228 |
| 1976 | 72,560 | 21,955 | 45,605 |

Plaintiff paid U.S. income tax on these so-called profits, less the expenses, $17,710 for 1975 and $17,764 for 1976. It is agreed that plaintiff was not required to account for these rents to the debtor. Plaintiff duly requested refunds and the suit here timely follows the Commissioner's denial.

Plaintiff says it commenced looking for a buyer in 1977, but effected a sale only in May 1978. The sale price was $1,237,500, of which $876,259 was allocated to the foreclosed property and $411,241 to the improvements S & L constructed after the foreclosure. This results in a loss on the foreclosed property of $206,000, before adjustment for the rental income, if any is to be made. Plaintiff would use the rental income to reduce this loss and thus pro tanto benefit its bad debt reserve, but it says its tax liability after 1976 would be unaffected because its annual deductions for the bad debt reserve were unaffected by losses within the range here in dispute. This is how § 593 works, apparently. Thus the benefit it claims for 1975 and 1976 pursuant to § 595 is likewise not limited to timing only. Defendant does not assert that the added tax it collected for 1975 and 1976 would, if refunded, be offset by any added tax liability in later years.

## I

The I.R.C. in § 593 designates certain organizations including "* * * any * * * domestic building and loan association" and tells how to calculate their bad debt reserves. We need not consider the approved methods used here as apparently the issue does not turn on them. Section 595 tells what is to happen in case a § 593 organization forecloses the security on a loan. In general, no gain or loss is recognized on the foreclosure, nor is any part of the debt deemed worthless in case the organization itself bids in at the foreclosure sale. Section 595(a). The property continues to have the same characteristics as the secured indebtedness previously had.

* * * Any amount realized by such organization with respect to such property shall be treated for purposes of this chapter as a payment on account of such indebtedness, and any loss with respect thereto shall be treated as a bad debt to which the provisions of section 166 (relating to allowance of a deduction for bad debts) apply. [26 U.S.C. § 595(b)]

The basis of such foreclosed property is the basis of the indebtedness for which it was security. Section 595(c).

The Secretary is authorized to prescribe such regulations as he may deem necessary to carry out the purposes of the section. Section 595(d). The whole of § 595 is attached to this opinion as an appendix.

The Revenue Act of 1962, Pub.L.No.87–834, 76 Stat. 960, added §§ 593 and 595 to the 1954 Code. The purpose was primarily to curtail the special deductions for bad debt reserves which had virtually eaten up the corporate income tax so far as it had applied since 1951 to organizations of the kind involved. S.Rep.No.1881, 87th Cong.2d Sess. 2 U.S.Code Cong. & Ad.News (1962) 3297, 3350. However, the Congress took the occasion also to change the tax treatment of a foreclosure when the lending organization took title to the security. There had been two taxable events: a gain or loss on the foreclosure itself and again on disposition of the property. As the legal definition of an S & L does not contemplate permanent ownership and operation of real property, it was clear that almost invariably, as here, the second event follows the first and determines the real impact of both on the fortunes of the S & L. So the new provision, in effect, collapses two taxable events into one. What the Senate Finance Committee saw as "erratic" tax consequences were avoided. The committee did not expressly state how rents during the S & L's temporary ownership should be dealt with, but did say, at 3350:

Because the foreclosed property is to have the same characteristics as the indebtedness, when property is rented by the mutual thrift organization after fore-

closure, no depreciation deduction is to be permitted. However, as explained above, if the property actually depreciates in worth (as contrasted to a mere decline in book value) a charge may be made against the reserve.

The material referred to above indicates a reliance by the committee on the supposed ability of the S & L to safeguard itself by making a charge against the reserve even before it has actually disposed of the foreclosed property. Presumably this charge would sometimes, but not always, have tax consequences. We presume, if plaintiff here had depreciated its foreclosed property on its books (as the committee said it was not to do) that would have had tax consequences in the tax years here involved, but a charge in those years against the bad debt reserve would not have.

It would appear to us, if gross income from rentals is not offset by deduction for depreciation as well as for direct expenses, figures will result that do not fairly reflect taxable income. Hence it seems unlikely the committee would have intended the rents to be taxed yet not allow any depreciation to be offset. Normally, if rent is treated as taxable income, a depreciation allowance is permitted to reduce the amount of the gross rent, since a portion of that gross rent represents a return of capital rather than income. Anomaly is avoided if "amount realized" in the statute and in the above committee report is read to include amounts realized in the form of rentals.

Such an interpretation appears otherwise natural and in accord with the common understanding of the terms. Defendant would limit the "amount realized" to the amount generated by the subsequent resale, deficiency recoveries against the debtor, etc. It may be noted that foreclosing creditors may under local law be accountable to the debtor for the rentals collected. If that occurs, the amounts realized as rental are exactly and literally "payments on the debt" in the statutory terms when so applied. Neither the statute nor the legislative history treat as making any difference, whether or not the debtor is entitled to such accounting for rentals.

The language of the statute is extremely broad. It provides that "[a]ny amount realized * * * with respect to" (emphasis supplied) the foreclosed property should be treated as a payment on account of the indebtedness. It is not limited, as the defendant and the regulation upon which it relies (see infra at 6) would restrict it, to "an amount representing a recovery of capital." Moreover, unlike section 1001 of the Code, which refers to the amount realized "from the sale or other disposition of property," § 595 uses the broader phrase amount realized "with respect to" the property. On its face, this provision covers the rents the plaintiff received from the property.

The fact that the statute uses the word "realized" is not inconsistent with this conclusion. The word is not here used in a restricted sense, but rather as meaning "received." Both the House and Senate Reports so indicate: "amounts received by the mutual savings institution subsequent to the foreclosure are to be treated as payments on the indebtedness." S.Rep.No. 1881, 87th Cong., 2d Sess. 47 (1962), reprinted in [1962] U.S.Code, Cong. & Ad.News 3297, 3350; H.R.Rep.No.1447, 87th Cong., 2d Sess. 37 (1962).

Defendant made some effort to persuade that "amount realized" is a technical term or words of art that, in this context would mean to somebody (a C.P.A.?) something different from what it means to you and me. This may be so, but without example or documentation, the notion remains just that, a notion. We cannot use it as a foundation for our decision. What the term may mean in some other context is not particularly helpful. The context of § 595 gives it its flavor here.

Both sides have much to say about the corollaries of their respective positions, i. e., how their interpretations would apply in other cases. It is a plain corollary of plaintiff's position that costs of management, heat, light, security, local real estate taxes, etc., must be deducted from the "amount realized" by plaintiff's view. By defend-

ant's they are deductions from current ordinary income. It could easily be that a temporarily owning S & L may incur more of such direct expenses than it collects in rents, and in that event, it would enthusiastically espouse defendant's view herein, while defendant would perhaps like plaintiff's better. If the lender foreclosed on a tax-exempt bond (unlikely with an S & L limited to real estate security), the income might by plaintiff's view have an effect via a credit to the bad debt reserve that would enhance the organization's taxable income, and eliminate the exemption in whole or part. In general, we do not think the parties have put before us anything to show that either interpretation, consistently applied, would produce strikingly anomalous effects, endanger the revenues, or open up an undesirable loophole.

There being nothing convincing to show we should not follow the plain meaning of the statute, the plain meaning must prevail. We conclude, therefore, that § 595 includes, among other "amounts realized" by a foreclosing S & L, to be charged against or credited towards the bad debt reserve, items of current income from the foreclosed property, rents, and items of corresponding "current cost."

## II

This conclusion focuses our next inquiry. Defendant does not rely on its construction of the statute alone. It cites Treasury Regulations § 1.595–1, TD 6814, 1965–1 C.B. 247, which now and since 1965 has very plainly said in (e)(7) of the above regulation that § 595 "does not change the treatment of rents, royalties, dividends, interest, or similar amounts received or accrued by the creditor with respect to acquired property, nor does it change the treatment of expenses incurred with respect to such property." The regulation then asserts for example that tax-exempt interest remains tax-exempt, and this exemption is not lost as defendant says would be a corollary of plaintiff's position here. The absence of change would mean the prior law would prevail, under which there is no question the rentals were current taxable income.

Although we must accord Treasury Regulations a reasonable deference, see *Commissioner v. Portland Cement Co. of Utah,* 450 U.S. 156, 169, 101 S.Ct. 1037, 1045, 67 L.Ed.2d 140 (1981), we cannot sustain this regulation since it is squarely contrary to the plain language of the statute. *Estate of Lovett v. United States,* 224 Ct.Cl. ——, 621 F.2d 1130 (1980).

Defendant does not argue that a regulation contrary to a statute can stand. Necessarily it depends on its arguments that we have rejected, as to the statute being open to two interpretations, and as to the alleged anomalous consequences should plaintiff's view prevail. As we have already said, we are not shown that the consequences of one view are measurably more anomalous than another. The Treasury seems to have earlier proposed for discussion a draft regulation which would have dealt with both rents and expenses in exactly the opposite manner to the regulation as adopted. An element of novelty in defendant's argument is its further point that in the "legislative history" of the regulation (not the statute) it appears that the United States Savings and Loan League, to which plaintiff belongs, and which is "the largest trade organization in the industry," opposed the original proposal and favored the addition to the regulation of paragraph (e)(7) because it wanted the rents to be taxable as income. The reason it gave was that it wanted to be free to pay dividends made up in part of such rents. When times were bad, foreclosures would increase and rents would replace other income not being received. These were matters for the Home Loan Bank Board rather than the IRS, but the League apparently feared that the tax accounting treatment of the rents would spread into the regulatory accounting. Defendant candidly admits that plaintiff is not estopped by the League position, but says it tends to substantiate the reasonableness of the regulation. No doubt it does, but the vice of the regulation is not that it is unreasonable but that it is contrary to the plain language of the statute as we read it. In

responding to the League's objections, the Treasury may have forgotten to reread the statute it was to construe. At any rate, this pseudo "legislative history" tends to neutralize the weight the regulation as adopted might otherwise have, as an early (but here, not the earliest) construction by those who were to have the duty of administering this novel statute.

### III

Near the close of its reply brief, defendant goes on to argue that the involved transaction was unique and peculiar, not typical of those that § 595 was written to deal with. In effect, defendant says, the plaintiff departed from its proper role as a secured creditor and became an equity investor in the foreclosed property. It did this by delaying foreclosure much too long after default in payment of interest, by continuing to pour money into the project after it had become clear it was a failing venture, and by holding it too long between foreclosure and sale to new owners. Plaintiff in its affidavits explains all this by the reluctance of a secured creditor to magnify its losses by becoming owner of unfinished property on which work was at a standstill, and by the difficulty it encountered finding a buyer even after it had finished the property and placed it on the market. About this, defendant says either too little or too much. Too little, if the object is to persuade us the case falls clear outside of § 595. In that event, it would be an offset claim by defendant. To introduce such a new issue at this time defendant would have to plead it, which it has not done, and to show, at least in outline or skeleton form, how the transaction should be taxed, and why the tax liability, properly computed, would reflect no overpayment. What is the law applicable? Does a single lapse from grace take a S & L outside § 595 as to all its foreclosures, or only as to the illicit one? What weight has the apparent silence of the regulatory agency, the Federal Home Loan Bank Board, on a matter apparently of primary concern to it? The plaintiff having offered a facially plausible explana-

tion of its acts by affidavits of its officers, the court cannot be expected to disbelieve it out of only its own scanty knowledge of the principles of banking. At least defendant should have offered some kind of expert opinion to justify the rejection. As things are, the point does not present a triable issue of fact under Rule 101(f), and therefore does not defeat summary judgment for plaintiff. On the other hand, defendant says too much if the object is only to show this to be a sport case that, like a hard one, tends to make bad law. There is nothing to show the case is really an odd one, except counsel's say so. But even sport cases must be decided according to the law written to govern them.

### IV

Plaintiff made an argument that it should be allowed depreciation of the property as a deduction. This is mooted, however, when we conclude, as we do, that the rents and related expenses should be reflected, for tax purposes, as adjustments to the bad debt reserve.

Accordingly, the defendant's motion for summary judgment is denied. The plaintiff's motion for summary judgment is granted. Judgment is entered for plaintiff in the amounts of $17,710 for 1975, and $17,674 for 1976, with interest on both amounts according to law.

### APPENDIX

§ 595. Foreclosure on property securing loans

(a) Nonrecognition of gain or loss as a result of foreclosure

In the case of a creditor which is an organization described in section 593(a), no gain or loss shall be recognized, and no debt shall be considered as becoming worthless or partially worthless, as the result of such organization having bid in at foreclosure, or having otherwise reduced to ownership or possession by agreement or process of law,

any property which was security for the payment of any indebtedness.

## (b) Character of property

For purposes of sections 166 and 1221, any property acquired in a transaction with respect to which gain or loss to an organization was not recognized by reason of subsection (a) shall be considered as property having the same characteristics as the indebtedness for which such property was security. Any amount realized by such organization with respect to such property shall be treated for purposes of this chapter as a payment on account of such indebtedness, and any loss with respect thereto shall be treated as a bad debt to which the provisions of section 166 (relating to allowance of a deduction for bad debts) apply.

## (c) Basis

The basis of any property to which subsection (a) applies shall be the basis of the indebtedness for which such property was security (determined as of the date of the acquisition of such property), properly increased for costs of acquisition.

## (d) Regulatory authority

The Secretary shall prescribe such regulations as he may deem necessary to carry out the purposes of this section.