**GIBRALTAR FINANCIAL CORPORATION OF CALIFORNIA,**
etc., Appellee,

v.

**The UNITED STATES, Appellant.**

**Appeal No. 86–1578.**

United States Court of Appeals, Federal Circuit.

July 28, 1987.

---

Gayle Miller, Tax Div., Dept. of Justice, of Washington, D.C., argued for appellant.

With her on the brief were Roger M. Olsen, Asst. Atty. Gen., Michael L. Paup and Jonathan S. Cohen, Washington, D.C.

Martin L. Schwartz and Aaron M. Peck, McKenna, Conner & Cuneo, of Los Angeles, Cal., argued for appellee. With them on the brief was Paul H. Lusby, Los Angeles, Cal.

Before MARKEY, Chief Judge, and RICH and NIES, Circuit Judges.

NIES, Circuit Judge.

The United States appeals the judgment of the United States Claims Court, 10 Cl.Ct. 31 (1986), in favor of Gibraltar Financial Corporation of California (GFC or taxpayer) for the amount of $15,119.17. Taxpayer had sought a refund of the tax which it was assessed in 1972 and 1973 on the portion of taxpayer's gain on sales of certain real property ("security property") which Internal Revenue Service determined was delinquent interest on the underlying defaulted real property loans. The Claims Court held that taxpayer was not required to include in ordinary income any gain from the sales of security property, but instead, under section 595 of the Internal Revenue Code of 1954 (I.R.C.), properly credited such gain to its bad debt reserve. We reverse.

I

The Claims Court decided this case on cross motions for summary judgment, the following facts being stipulated. *See* 10 Cl.Ct. at 32–33.

Taxpayer GFC is a corporation which, during the calendar years 1972 and 1973, owned substantially all of the issued and outstanding capital stock of Gibraltar Savings and Loan Association (Gibraltar). During those years, GFC, Gibraltar, and certain other affiliated corporations constituted an affiliated group within the meaning of I.R.C. § 1504. Under I.R.C. § 1501, an affiliated group of corporations may elect to file a consolidated return as was done in this case.

Gibraltar, a California corporation, is a savings and loan association, and as such it qualified during the years in issue as a domestic building and loan association within the meaning of I.R.C. § 7701(a)(19). Gibraltar was thereby covered by a special set of rules contained in I.R.C. §§ 591–596. Gibraltar reported its taxable income for the years in question using the cash receipts and disbursements method of accounting as permitted by I.R.C. § 446(c)(1). For purposes of computing its bad debt deduction, Gibraltar used the reserve method of accounting for bad debts, as provided by I.R.C. §§ 166(c), 593(b)(2). Under that method, Gibraltar computed additions to its bad debt reserve based on a percentage of its taxable income, up to a designated maximum amount.

Gibraltar's business consists of attracting savings deposits from the general public and lending money, primarily on the security of interests in real property. The method of financing involved here took the form of a promissory note secured by a first lien deed of trust on the residential real property being purchased by the borrower. The trust deeds contain a power of sale provision authorizing the named trustee to sell the security property, upon default by the borrower, at a public trustee sale without resort to judicial proceedings. The borrower had no claim to any portion of the sales proceeds.

During 1972 and 1973, Gibraltar exercised its right of foreclosure with respect to sixty single-family residential real property mortgages on which the borrowers defaulted. In each case, the sole consideration received by Gibraltar in satisfaction of a borrower's obligation came from its foreclosure on, and subsequent sale of, the security property. At the time each security property was reduced to Gibraltar's ownership or possession, there remained unpaid to, and uncollected by, Gibraltar an amount of interest that had accrued on the defaulted loan. However, because Gibraltar used the cash method of accounting, such interest was not treated or reported as income as it accrued.

On acquiring each security property, Gibraltar adjusted its basis in the parcels to reflect its cost of acquisition and any capital improvements it made to the property. The proceeds of each sale exceeded Gibraltar's basis in the security property as so adjusted. On the consolidated federal income tax returns, taxpayer credited the entire amount of the gain from each sale to its bad debt reserve, and treated no portion as ordinary income. On audit, however, the Internal Revenue Service determined that taxpayer was required to treat a portion of the gain as receipt of accrued but unpaid interest. The recovery of accrued but unpaid interest, per IRS, cannot be credited to a bad debt reserve, but rather is taxable as ordinary income under section 61(a)(4).

Following the requisite payment and refund procedures, taxpayer brought two suits in the United States Claims Court, which consolidated those two suits into the instant action.

II

The ultimate question presented by this appeal is whether Congress, by the 1962 amendments to the I.R.C. which added section 595, intended that amounts realized in excess of basis by a section 593 reserve method taxpayer, upon the ultimate disposition of foreclosed real property, should be credited to section 593 bad debt reserves, or to the extent that there was accrued but unpaid interest secured by such property, owing to the taxpayer as of the date of foreclosure, such excess should be treated as ordinary income. The resolution of that issue turns on the interpretation of the following language of section 595:

(a) In the case of a creditor which is an organization described in section 593(a), no gain or loss shall be recognized . . . as the result of such organization having . . . reduced to ownership or possession by agreement or process of law . . . any property which was security for the payment of any indebtedness.

(b) For purposes of sections 166 and 1221, any property acquired in a transac-

tion with respect to which gain or loss to an organization was not recognized by reason of subsection (a) shall be considered as property having the same characteristics as the indebtedness for which such property was security. *Any amount realized* by such organization with respect to such property shall be treated for purposes of this chapter as a payment on account of such indebtedness, and any loss with respect thereto shall be treated as a bad debt to which the provisions of section 166 (relating to allowance of a deduction for bad debt) apply. [Emphasis added.]

Taxpayer reads section 595(b) to mean that all tax consequences of foreclosure are to be accounted for through credit and debit adjustments to the bad debt reserve by a taxpayer which uses the section 593 bad debt reserve method. Thus, per taxpayer, it follows that amounts in excess of basis realized by a taxpayer using the reserve method upon sale of the foreclosed property should be accounted for by credits to the bad debt reserve whether or not there is unpaid interest owed to taxpayer at the date of foreclosure. In support of its position, taxpayer relies on the plain language of the statute, legislative history from which it infers congressional intent that the section has such effect, other statutes which must be construed *in pari materia,* anomalous results from the government's interpretation, and public policy in favor of home ownership. Taxpayer urges that the Claims Court correctly held that Treas.Reg. § 1.595–1(e)(6) (1965), which interprets the words "any amount realized" in section 595(b), is contrary to the statute. That regulation states in pertinent part:

> An amount realized with respect to acquired property means an amount representing a *recovery of capital,* such as proceeds from the sale or other disposition of the property.... [Emphasis added.]

Relying on the same principles of statutory construction, IRS maintains that re-covery of interest due has always been treated as ordinary income, that section 595(b) has no specific or "plain language" to credit recovered interest to a bad debt reserve, that the legislative history does not address recovery of the interest portion of the debt, and that section 595(b) provides that sales proceeds take on the characteristics of the indebtedness. Per IRS, that provision means that, where there is a gain, the proceeds consist of principal and interest components, the latter being taxable as ordinary income. Thus, per IRS, its interpretation that gain be treated as ordinary income to the extent of interest due at the time of foreclosure as well as the regulatory definition of "any amount realized" is a reasonable construction of the statute. IRS's interpretation, that recovery of accrued but unpaid interest cannot be credited to the bad debt reserve, but must instead be reported as ordinary income under I.R.C. § 61(a)(4), is long-standing and has been consistently applied. Rev.Rul. 75–251, 1975–1 C.B. 175.

The question presented is not novel in the courts. In *First Charter Financial Corp. v. United States,* 669 F.2d 1342 (9th Cir.1982), the Ninth Circuit accepted the IRS position, holding that Treas.Reg. § 1.595–1(e)(6) reasonably interpreted the statute:

> At least to the extent that it provides that receipt of accrued but unpaid interest is not credited to the bad debt reserve, the regulation [Sec. 1.595–1(e)(6)] harmonizes with the statute's plain language, origin, and purpose. The regulation carries out Congress' purpose of adjusting the bad debt reserve to reflect the lender's ability to recover its basis. It preserves the distinction in prior law that receipt of interest is income and not a recovery of principal or a capital asset.

669 F.2d at 1348–49. In a concurring opinion, one member of the panel relied primarily on the statutory language itself and found it necessary to "blunt" the literal language of the regulation, which he characterized as an "example of poor regulation

writing," to avoid distortion of the statute. *Id.* at 1351 (Sneed, J., concurring).

■ We are, of course, not bound by the Ninth Circuit's ruling. On the other hand, uniformity among the circuits is particularly desirable in tax cases to ensure equal application of the tax system to our citizenry. Thus, we are not inclined to reach a result in conflict with the Ninth Circuit unless the statute or precedent of this court[1] gives us, in our view, no alternative.

■ In this case, we agree in substance with the Ninth Circuit. We conclude that the statute may reasonably be interpreted—in view of the provision that the "characteristics of the indebtedness" attach to "any property acquired"—to allow the treatment of a portion of the sales proceeds as recovered accrued interest. While not the only possible interpretation, Treasury's interpretation is reasonable as restricted to situations where taxpayer enjoys a gain as a result of foreclosure. Accordingly, that interpretation must be upheld. *Minnesota Power & Light Co. v. United States,* 782 F.2d 167, 170 (Fed.Cir.1986).

The Claims Court reached the opposite result because it believed the issue here was controlled by the precedent of *First Federal Savings & Loan Ass'n of Bristol v. United States,* 228 Ct.Cl. 569, 660 F.2d 767 (1981). 10 Cl.Ct. at 34. We are entirely in agreement with the holding in *Bristol* that the *rent* received by a savings and loan on foreclosed property is an "amount realized" which is to be treated as payment on the indebtedness under I.R.C. § 595(b) the same as the sales proceeds, and which, in the case of no gain over basis, may be credited by the taxpayer to its bad debt reserve. However, that case did not address the question here. In *Bristol* the proceeds plus rents did not exceed taxpayer's basis so that taxpayer suffered a loss. Here, the sales proceeds exceed the taxpayer's basis, resulting in a gain. Further, part of the underlying indebtedness here is accrued but unpaid interest. In *Bristol,* rents were not part of the borrower's indebtedness. We disagree, therefore, with the Claims Court that *Bristol* controls the result in this case. Since the holdings of *Bristol* and *First Charter* can peacefully co-exist, and we are persuaded that *First Charter* correctly ruled that a portion of the gain received by a cash method taxpayer may properly be attributed to recovery of accrued interest and, thus, taxed as ordinary income, we hold that the Claims Court erred as a matter of law in holding that this amount was a nontaxable credit to taxpayer's bad debt reserve.

### III

Under I.R.C. § 61(a)(4), a taxpayer is required to report interest as ordinary income. Treas.Reg. § 1.61–7(a). The year in which that interest is includible in taxable income depends upon the taxpayer's method of accounting. A taxpayer using the cash method of accounting must report interest in the year in which it is actually or constructively received, whereas an accrual method taxpayer must report it for the year in which the interest accrues. I.R.C. § 451; Treas.Reg. § 1.451–1(a).

Prior to the enactment of Section 595 of the Code in 1962, a body of case law developed under which a cash method mortgagee was deemed to have received ordinary income to the extent of accrued but unpaid interest upon the acquisition of property in a mortgage foreclosure.[2] Under the then-existing case law, a mortgagee using the cash method was required to recognize accrued but unpaid interest as taxable income

---

1. This court adopted the decisions of the United States Court of Claims as precedent in *South Corp. v. United States,* 690 F.2d 1368, 1370, 215 U.S.P.Q. 657, 658 (Fed.Cir.1982).

2. This body of case law did not apply to an accrual basis mortgagee who had already reported the interest as income prior to the foreclosure, which would generally be the case. If the interest income were not properly accruable (e.g., because collection was too uncertain) an accrual method lender would be on the same footing as a cash method lender. *See Corn Exch. Bank v. United States,* 37 F.2d 34, 35 (2d Cir.1930).

where the mortgagee "bought in" at a mortgage foreclosure sale or sold to a third party by applying the bid price, not only to the amount of the principal debt, but also the amount of the delinquent interest. *See, e.g., Helvering v. Midland Mut. Life Ins. Co.,* 300 U.S. 216, 57 S.Ct. 423, 81 L.Ed. 612 (1937);[3] *Great Southern Life Ins. Co. v. Commissioner,* 89 F.2d 54 (5th Cir.), *cert. denied,* 302 U.S. 698, 58 S.Ct. 16, 82 L.Ed. 539 (1937). A cash method mortgagee was also required to recognize accrued but unpaid interest as taxable income where the mortgaged property was acquired in lieu of foreclosure, and the fair market value of the property exceeded the basis of the debt (plus costs). *See, e.g., Helvering v. Missouri State Life Ins. Co.,* 78 F.2d 778, 780 (8th Cir.1934).

In enacting I.R.C. § 595, Congress did not discuss accrued but unpaid interest or the body of case law regarding treatment of that interest as ordinary income. The Senate Report does, however, explain the objectives of the bill that became section 595:

> **Foreclosures on property securing loans.**—The bill also adds a new provision to the code containing rules to govern the tax consequences of mortgage foreclosures (or other similar proceedings) in which a mutual savings institution takes over property which was security for its loan. Under existing law the foreclosure event is considered a taxable transaction. This has been interpreted to mean that a bad-debt deduction may or may not arise at that time, depending upon the relation of the bid price of the property to the amount of the loan outstanding. Where the foreclosed property is bid in for the amount of the loan a bad debt deduction may not be taken under present law; however, a gain or loss may result at the time of foreclosure if the fair market value of property foreclosed is different from the price at which it was bid in. When the property is subsequently sold by the mutual savings institution, it may realize a further gain or loss on such disposition....

> The bill seeks to avoid these erratic results by providing that in the future a foreclosure is not to be treated as a taxable event, and that amounts received by the mutual savings institution subsequent to the foreclosure are to be treated as payments on the indebtedness. *This would be accomplished under the bill by treating the property received in a foreclosure (or other proceeding) as having the same characteristics as the debt for which it was security....* When the property is ultimately sold or disposed of, the difference between any amount realized and the original or previously reduced debt, is to be treated as ordinary loss or income and [sic, or [4]] is to be charged, or credited, as the case may be, against the reserve for losses on qualifying real property loans. *Because the foreclosed property is to have the same characteristics as the indebtedness, where property is rented by the mutual thrift institution after foreclosure, no depreciation deduction is to be permitted.*

S. Rep No. 1881, 87th Cong., 2d Sess. 47 (1962), *reprinted in* 1962 U.S. Code Cong. & Admin. News 3297, 3350 (emphasis added); *see also* H.R.Rep. No. 1447, 87th Cong., 2d Sess. 37 (1962).

Thus, under the amended statute, Congress intended that savings and loan asso-

---

**3.** In *Midland Mutual Life,* a cash method mortgagee was required to recognize accrued interest as taxable income when, upon the foreclosure of a mortgage, the mortgagee bid in the property for an amount equal to the unpaid principal and accrued interest, even though the property purchased had a fair market value less than the bid price.

**4.** The Claims Court correctly observed:

> [U]se of the conjunctive was unintended; the disjunctive "or" must be substituted to avoid a nonsensical result. Upon the property's final disposition, the mortgagee may either take a bad debt deduction or recognize ordinary gain, Treas.Reg. § 1.166–1(a)(1), or charge or credit its bad debt reserve, Treas.Reg. § 1.166–1(a)(2), depending on which method it has elected under the regulations. It may not do both.
> 10 Cl.Ct. at 37 n. 4.

ciations no longer could recognize gain or loss at the time of foreclosure. Congress was of the view that foreclosure was essentially a step in the process of collecting on the loan; accordingly, the taxable event was postponed until the collection process actually yielded proceeds from the sale or other disposition of the acquired property. Thus, the amendments made a major change from prior law by telescoping events into a single transaction for tax purposes which occurred at the time the property was sold.

Further, I.R.C. § 595 provides that any loss with respect to the indebtedness as a result of that taxable event "shall be treated as a bad debt to which the provisions of section 166 ... apply." That much is clear. Here, however, we have a gain, not a loss.

Taxpayer argues that the plain language of the statute requires that any amount realized be credited to a bad debt reserve. In particular taxpayer relies on I.R.C. § 1001 which defines "amount realized" as "the sum of any money received plus the fair market value of the property (other than money) received" which, when read into I.R.C. § 595 would mean, per taxpayer, that "amount realized" includes recovered interest. Further, Treas.Reg. 1.595–1(e)(6)(i) expressly provides that "[a]ny amount realized shall ... to the extent that such amount exceeds the adjusted basis [for a section 593 taxpayer] ... be credited to the appropriate bad debt reserve...."

The government argues that "any amount realized" is an ambiguous term in I.R.C. § 595(b) and that, as interpreted in Treas.Reg. 1.595–1(e)(6), the term is limited to the "recovery of capital." Thus, the provision of the regulation which directs crediting to a bad debt reserve does not apply to the recovery of the interest portion of the underlying indebtedness.

Read as a whole, we must agree with the government that section 595(b) does not provide a solution to the problem here on the basis of "plain meaning" of the statutory language. While in Bristol, the court held that "any amount realized" has a plain

meaning and thus includes moneys received as rents as well as sales proceeds, the question there was whether rents received after foreclosure had to be reported as income or could be treated as payment on the taxpayer's indebtedness. No gain was achieved on ultimate disposition of the property even including these rents. Thus, that decision did not necessitate interpretation of the other provision of section 595(b) that "[f]or purposes of sections 166 and 1221, any property acquired in a transaction with respect to which gain or loss to an organization was not recognized by reason of subsection (a) shall be considered as property having the same characteristics as the indebtedness for which such property was security." The meaning of that provision is far from "plain." Further, the government is correct that section 595(b) does not direct how recovered interest or, indeed, any gain must be treated. It states only that any amount realized shall be treated as payment on account of the underlying indebtedness. While the meaning of the phrase "any amount realized" is plain, as held in Bristol, the meaning of the entire paragraph is not.

Nor can we agree with taxpayer that Treas.Reg. 1.595–1(e)(6)(i), which directs credit of a gain to a bad debt reserve, supports taxpayer's position. The language on which taxpayer relies is restricted by the part of the regulation which limits "amount realized" to "recovery of capital." Taxpayer may not rely on only the rest of the regulation, thereby giving it a meaning clearly not intended.

The legislative history of the 1962 amendments is virtually of no value in resolving the issue before us. We have been directed to no portion of any report and have found none which addresses the treatment of accrued but unpaid interest. Statements therein regarding the charging or crediting of reserves reflects the general scheme and cannot be said to extend ipso facto to the narrow question raised here. Similarly, we reject the view that the legislative purpose divined from the statutory

language, legislative history, and other parts of the code is that *all* proceeds from a sale in excess of basis must be accounted for through a credit to the section 593 bad debt reserve. On the contrary, the provision of section 61 and prior precedent to the effect that interest is to be treated as ordinary income where recovered following foreclosure at least makes viable the government's argument that Congress would have likely addressed such a major departure from that established law and that its failure to do so is some indication that no such change was intended.

Taxpayer also asserts that section 595 must be liberally construed to encompass recovery of interest debt because of the liberal bad debt provisions of section 593. Per taxpayer, the special reserve allowance of section 593 reflects Congress' desire to encourage the residential lending activities of savings and loans associations and to provide them with a cushion against recurrence of the extraordinary losses under unfavorable market conditions. While section 593 has such purpose, we cannot agree that such considerations dictate that the portion of the gain which is applied to the interest debt should be excluded from a taxpayer's income. Section 595 applies not only to the reserve method taxpayers of section 593, but also to non-reserve method taxpayers. We see no policy reason that requires overturning the treatment of recovered interest when that was the situation under section 593 prior to the 1962 amendments.

Taxpayer poses a number of hypothetical situations which would, in its view, result in anomalous results. Having considered each of them, we simply say at this point that we do not agree that the hypotheticals mandate adoption of taxpayer's interpretation.

## IV

Unpersuaded that the statute has a plain meaning, we must still determine whether the government's interpretation of the statute is reasonable.

The government argues that the treatment of recovered interest as taxable income is resolved by its long-standing definition of "an amount realized" in Treas.Reg. 1.595–1(e)(6) as "recovery of capital." Thus, "an amount realized" must exclude, per its view, the recovery of interest due, which *a fortiori* is not recovery of principal. At the same time the government reads section 595, in what appears to be a manner inconsistent with the regulation, to mean that the "indebtedness" has principal and interest components both of which are paid off to the extent of "any amount realized."

Despite the *Bristol* decision, as well as the *First Charter* decision, both of which have indicated that Treas.Reg. 1.595–1(e)(6) is, at best, poorly drafted and clearly wrong as applied in *Bristol*, Treasury has not taken heed and revised it appropriately. That we do not approve the regulation in all respects does not, however, warrant overturning Treasury's interpretation that section 595(b) imbues the proceeds with the characteristics of the underlying indebtedness and that a gain from a sale of property which secures interest indebtedness constitutes a payment of such interest, resulting in taxable income.

Taxpayer argues that Treasury's interpretation of section 595(b) concerning principal and interest components of the underlying indebtedness ignores the explicit language of section 595(b) that the "characteristics" of the indebtedness provision is only "for purposes of sections 166 and 1221." Per taxpayer, the reference to section 166 in section 595(b) precludes deductions for exhaustion, wear and tear, obsolescence, amortization, or depletion, as stated in Treas.Reg. 1.595–1(e)(1), and that is its sole purpose. We cannot agree. I.R.C. § 166 (1982) authorizes a reserve for bad debts which is detailed for a section 593(a) taxpayer in section 593(b). Under section 595(b), the property retains the characteristics of the underlying debt, that is, principal and interest components, for the purposes of the bad debt reserve authorized by

section 166. Nothing in the regulation, the legislative history, or the provision itself purports to limit the "characteristics" provision of section 595 to a single purpose of section 166. In short, we reject the view that the sole purpose of the section 166 limitation in section 595(b) is to preclude the above-listed deductions.

Taxpayers' remaining arguments may be disposed of summarily.

Taxpayer argues that requiring savings and loan associations to include any part of the gain as taxable income violates public policy favoring home ownership. Their argument derives from two premises, both of which we will accept for purposes of this discussion. First, taxpayer asserts "Statutes should be construed in a manner that will promote sound public policy," citing (rather loosely) *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 737, 95 S.Ct. 1917, 1926, 44 L.Ed.2d 539 (1975), and *Gates v. Collier,* 616 F.2d 1268, 1275 n. 11 (5th Cir.1980). Second, taxpayer asserts "It is basic public policy to encourage home ownership and, as a corollary, have mortgage lenders exercise reasonable restraint and forbearance with regard to their foreclosure policies." From these premises, taxpayer makes a logical leap of breathtaking length:

> Savings and loan associations would have an economic incentive *not* to exercise restraint and forbearance in their dealing with delinquent borrowers and, instead, to rush to consummate a foreclosure as rapidly as possible, thereby minimizing the accrual of unpaid interest and thus the taxable portion of the disposition proceeds.

As a factual matter, taxpayer offers nothing in support of its argument that the continued taxation of interest has turned savings and loan associations into a modern-day Simon Legree, bent on turning delinquent home-buyers into the street. We can assume that the decision when to foreclose is subject to considerations other than the tax treatment of accrued but unpaid interest. As a logical matter, the mere existence of a policy favoring home ownership does not mean that there are no countervailing policies or considerations and that anything tending to disserve that policy must fall. Indeed, that policy never entered into the case law that arose prior to the enactment of section 595. We reject taxpayer's public policy argument as totally unfounded. In any event, that kind of consideration must be left to Congress except in limited circumstances, *see Blue Chip Stamps,* 421 U.S. at 737, 95 S.Ct. at 1926, which this case does not present.

■ Returning to taxpayer's hypotheticals which purportedly show that Treasury's interpretation would produce absurd and anomalous results, we accept the proposition that "an absurd construction of a statutory provision should be avoided." *Witco Chem. Corp. v. United States,* 742 F.2d 615, 619 (Fed.Cir.1984). We do not, however, agree that any of taxpayer's hypotheticals establish absurdity in the interpretation adopted here.

Taxpayer's first hypothetical posits that different tax treatment will result where one savings and loan forecloses on a loan immediately after default and another waits six months before defaulting. That situation raises no absurdity; the amount of accrued interest varies depending on the amount of time the taxpayer waits before foreclosing. It is not strictly true, as taxpayer suggests, that each savings and loan in the first hypothetical "derived an equivalent economic benefit." Likewise, taxpayer's second hypothetical, where only the interest rates differ, demonstrates no absurdity. We can see no reason why income tax consequences should not vary depending on the amount of interest charged. Taxpayer's third hypothetical demonstrates only that different tax consequences follow from different bases in the mortgages. That result seems to us entirely logical.

Nor do we find absurdity in that taxpayers on a cash basis are permitted to defer recognition of income until disposal of the foreclosed property while those on the accrual basis would recognize interest income

as it accrued. 10 Cl.Ct. at 35. This disparity in timing is nothing more than a direct result of the difference between accrual method and cash method taxpayers. As recognized in *First Charter*, a real disparity would occur if cash method taxpayers were allowed to credit accrued but unpaid interest to their bad debt reserve:

An accrual method taxpayer recognizes interest as it accrues. It will therefore take ordinary income at the time the payment is due. The amount previously reported as accrued interest is applied to the taxpayer's basis in the property. Consequently, all that it receives when it sells the foreclosure property is a recovery of capital. Treas.Reg. § 1.595–1(d). Any recovery of that interest from the sale of the property cancels out this increase in basis, and no credit is assigned to the bad debt reserve.

If the recovery of accrued but unpaid interest by a cash method taxpayer is not treated as ordinary income, the cash method taxpayer will take a nontaxable credit to its bad debt reserve. This credit may or may not reduce the taxpayer's bad debt deduction in a later year. The cash method taxpayer at least defers the gain. A mere difference in choice of accounting method should not have such significant consequences, absent some clear indication to the contrary.

669 F.2d at 1349–50 (footnote and citation omitted).

## V

### Conclusion

Taxpayer has failed to establish its entitlement to a refund in 1972 and 1973. Treasury's requirement that the amounts in dispute be deemed the recovery of accrued but unpaid interest which is taxable as ordinary income in those years is based on a reasonable interpretation of I.R.C. § 595. Accordingly, we reverse the judgment of the Claims Court.

REVERSED.