**BANKERS TRUST NEW YORK CORPORATION and Consolidated Subsidiaries, Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

**No. 99–5066.**

United States Court of Appeals, Federal Circuit.

Sept. 20, 2000.

Before PLAGER, LOURIE, and CLEVENGER, Circuit Judges.

PLAGER, Circuit Judge.

This is a tax refund case, on appeal from the United States Court of Federal Claims. The United States Internal Revenue Service ("IRS") refused to allow Bankers Trust New York Corporation and Consolidated Subsidiaries (collectively "Bankers Trust") to claim a foreign tax credit for certain taxes assessed by and paid to Brazil on the interest earned from loans to borrowers in that country. When Bankers Trust sued to obtain the credit sought, the Court of Federal Claims granted the Government's motion for summary judgment denying the tax credit. *See Bankers Trust New York Corp. v. United States*, 36 Fed. Cl. 30 (1996). Bankers Trust appeals the ruling of the Court of Federal Claims. Because the Court of Federal Claims erred in not following binding precedent, we reverse the judgment of the Court of Federal Claims.

## BACKGROUND

Bankers Trust is the common parent for a group of U.S. corporations that filed a consolidated income tax return for tax year 1980. Bankers Trust had outstanding loans to customers in Brazil during tax year 1980. Following an audit of tax year 1980, Bankers Trust claimed on its U.S. income tax return an additional Foreign Tax Credit ("FTC") for taxes paid to Brazil. The FTC provides U.S. taxpayers with tax credits for taxes paid to foreign governments, with the purpose of avoiding double taxation of the income. *See* I.R.C. § 901(b)(1) (1976).[1] The credit is applied directly to the taxpayer's tax liability. The additional credit claimed by Bankers Trust was for taxes that had been assessed by and paid to Brazil on the interest earned

Thomas C. Durham, Mayer, Brown & Platt, of Chicago, Illinois, argued for plaintiff-appellant. With him on the brief were Joel V. Williamson, Russell R. Young, Mayer, Brown & Platt, of Chicago, Illinois; and Kim Marie Boylan, Mayer, Brown & Platt, of Washington, DC.

Charles Bricken, Attorney, Tax Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Loretta C. Argrett, Assistant Attorney General; and David English Carmack, Attorney.

---

1. § 901. Taxes of foreign countries and of possessions of United States

   (b) Amount allowed.—Subject to the limitation of section 904, the following amounts shall be allowed as the credit under subsection (a):

   (1) Citizens and domestic corporations.—In the case of a citizen of the United States and of a domestic corporation, the amount of any income ... taxes paid or accrued during the taxable year to any foreign country or to any possession of the United States.

on Brazilian loans in that year, but only part of which had been claimed on the original return.

All of the loans at issue in the present case were 'net' loans. In a net loan, the lender and borrower agree on an interest rate that the lender is to receive, net of taxes—that is, the borrower pays the lender the agreed interest, and the borrower also pays any taxes levied by the borrower's jurisdiction on the interest income received by the lender. As a consequence of this arrangement, the amount of interest the borrower owes remains constant. In terms of the borrower's overall liability, however, the risk of change in the tax rate is on the borrower, both negatively (if the rate goes up, the borrower pays more) and positively (if the rate goes down, the borrower pays less).

Under Brazilian tax law in effect in 1980, even under a net loan, the foreign lender was the party legally responsible for paying to Brazil the income tax levied on the interest that the lender earned from loans to Brazilian borrowers. However, to ease its collection problems, the Brazilian government placed upon the borrower the responsibility for withholding the tax and paying it to the government. The borrower could not obtain the foreign currency from its local correspondent bank needed to make the interest payment to the foreign lender without first demonstrating that it had paid the Brazilian tax. It did this by paying to the local bank, for subsequent transmittal to the government, the amount of tax due on the interest payment.

Because of certain historical practices (related to its problems with maintaining its foreign exchange balances), at the time in question, Brazil taxed the interest on foreign loans at a 25% rate, and then provided a "pecuniary benefit" to the borrower. The pecuniary benefit was a subsidy, proportional to the amount of tax paid, that was returned to the borrower after payment of the tax. The original amount of the pecuniary benefit was 85% of the tax paid. The combined effect of the 25% tax rate and 85% pecuniary benefit resulted in an effective tax rate of 3.75% (25% paid − (85% × 25%) refunded = 3.75% effective rate).

The amount of the benefit fluctuated somewhat over time, and its exact amount at the time in question is not entirely clear from the record. The actual amount, however, is not important to the issue before us. What is important is that, though the legal obligation for the tax belonged to the foreign lender, because the loans were net loans the effect of the pecuniary benefit was to return a portion of the tax paid directly to the borrower, and not to the foreign lender.

Brazilian law imposed minimum size and length of term requirements on foreign loans. In order to assist small borrowers whose attempts to obtain foreign loans were hindered by these regulations, Brazilian law provided for 'repass' loans. In a repass loan, a Brazilian bank would borrow money from a foreign lender such as Bankers Trust, and then lend it out in smaller parcels to borrowers. The Brazilian bank collected the tax and received the pecuniary benefit, which it was required to pass on to the repass borrowers. In a repass loan, Bankers Trust had no direct financial relationship with the ultimate borrower, the third party that actually received the pecuniary benefit.

The IRS originally allowed taxpayers lending to Brazil to claim a full FTC on amounts paid as tax to Brazil (i.e., calculated using the 25% tax rate), ignoring the pecuniary benefit. See, e.g., Priv. Ltr. Rul. 7611239900A (Nov. 22, 1976). However, in 1978, the Service changed this position in a revenue ruling. See Rev. Rul. 78–258, 1978–1 C.B. 239. It later codified this ruling in a treasury regulation. See Temp. Treas. Reg. § 4.901–2(f) (1980) (effective for tax years ending after June 15, 1979). The regulation provided that if any part of the tax paid was refunded to the taxpayer or to an entity which engaged in a business transaction with the taxpayer, then that

part of the tax was not eligible for the FTC.[2]

For tax year 1980, Bankers Trust originally complied with the regulation and did not claim the FTC for the amount of the tax that was refunded to the Brazilian borrower in the form of the pecuniary benefit. However, after an IRS audit, Bankers Trust requested a refund equal to the amount of FTC not originally claimed, alleging that the failure to receive the full FTC was erroneous. When it did not receive the refund after six months, Bankers Trust, as allowed by law, filed suit in the Court of Federal Claims.

Before the Court of Federal Claims, Bankers Trust challenged the validity of Temporary Treasury Regulation § 4.901–2(f), claiming it was invalid because it failed to take into account whether the taxpayer had received an 'economic benefit' from the subsidy. Since Bankers Trust received no such benefit, it took the position that it was entitled to the entire amount of tax paid.

Even more to the point, Bankers Trust argued that the regulation conflicted directly with binding legal precedent. In the Mexican Railroad Car cases[3] (discussed in detail infra), the United States Court of Claims had considered transactions mechanically identical to the Brazilian transactions. The Court of Claims concluded that what happened in the foreign country was that country's business, and therefore the foreign subsidy was ir-

relevant; the FTC should be applied to all tax that was paid, regardless of what happened after that. Under this precedent, argued Bankers Trust, it should receive the FTC for the full amount of taxes paid, not just the net after the subsidy is applied. Further, Bankers Trust argued, the IRS, as an administrative agency, lacked the power to overrule by regulation a precedent of an appellate tribunal.

Since the parties agreed that there were no disputed factual issues (all facts were submitted in the form of a joint stipulation), disposition on summary judgment was appropriate. The Court of Federal Claims ruled in favor of the IRS.

The Court of Federal Claims found the regulation to be a valid exercise of authority delegated to the IRS. The Court of Federal Claims particularly noted that the Seventh and Eighth Circuits recently had both ruled directly on the same question and found the regulation valid. *See Continental Ill. Corp. v. Commissioner,* 998 F.2d 513 (7th Cir.1993); *Norwest Corp. v. Commissioner,* 69 F.3d 1404 (8th Cir. 1995). While these decisions are not binding on the Court of Federal Claims, the court found them persuasive in their own right, and concluded that they should be followed in the interest of harmony among the circuits.

With respect to the Mexican Railroad Car cases, the Court of Federal Claims held that Temporary Treasury Regulation

**2.** (f) Amount of income tax paid or accrued—
   (3) Subsidies—
      (i) General rule. An amount is not income tax paid or accrued to a foreign country to the extent that—
         (A) The amount is used directly or indirectly by the country to provide a subsidy by any means (such as through a refund or credit) to the taxpayer; and
         (B) The subsidy is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the taxpayer.
      (ii) Indirect subsidies. A foreign country is considered to provide a subsidy to a person if the country provides a subsidy to another person that—

(A) Is owned or controlled, directly or indirectly, by the same interests that own or control, directly or indirectly, the first person; or
(B) Engages in a business transaction with the first person, but only if the subsidy received by such other person is determined directly or indirectly by reference to the amount of income tax, or the base used to compute the income tax, imposed by the country on the first person with respect to such transaction.

**3.** *See, e.g., Chicago, Burlington, & Quincy R.R. Co. v. United States,* 197 Ct.Cl. 264, 455 F.2d 993 (1972); *Missouri Pac. R.R. Co. v. United States,* 204 Ct.Cl. 837, 497 F.2d 1386 (1974).

§ 4.901–2(f) had effectively overruled those cases. The Court of Federal Claims noted that it was required to follow Court of Claims precedent unless it had been "overruled by the court en banc, or by other controlling authority such as an intervening statutory change or Supreme Court decision." *Texas Am. Oil Co. v. United States Dep't of Energy,* 44 F.3d 1557 (Fed.Cir.1995) (en banc). The Court of Federal Claims found the regulation to be "other controlling authority" and held that it was thus not required to follow the Mexican Railroad Car cases.

Bankers Trust appeals the judgment of the Court of Federal Claims, essentially on the same grounds urged before the Court of Federal Claims. In addition to challenging the validity of the regulation, Bankers Trust asserts that an agency regulation, assuming it is valid, is not sufficient "other controlling authority" to overrule otherwise binding precedent; the Court of Federal Claims's holding that an agency regulation can overrule the decision of an appellate court was a violation of the Separation of Powers doctrine.

## DISCUSSION

### I.

█ When, as here, both parties agree that there are no material facts in dispute precluding summary judgment, our task on appeal from a summary judgment is to determine whether the judgment granted is correct as a matter of law. *See Marathon Oil Co. v. United States,* 177 F.3d 1331, 1337 (Fed.Cir.1999), *rev'd on other grounds sub nom. Mobil Oil Co. v. United States,* —— U.S. ——, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000). We review the Court of Federal Claims's understanding of the law without deference. *See Cohen v. United States,* 995 F.2d 205, 207 (Fed. Cir.1993).

### II.

Bankers Trust first challenges on several grounds the validity of Temporary Treasury Regulation § 4.901–2(f). This is an issue for which Bankers Trust is well re-

hearsed; it participated as amicus in a case in the Eighth Circuit a few years ago on similar facts, raising essentially the same issues. *See Norwest Corp. v. Commissioner,* 69 F.3d 1404 (8th Cir.1995). It lost there, just as the same arguments against the regulation had lost in an earlier case in the Seventh Circuit. *See Continental Ill. Corp. v. Commissioner,* 998 F.2d 513 (7th Cir.1993). We can spare Bankers Trust another record loss since we find that we need not definitively resolve this issue to dispose of the case; it will suffice for our present purposes simply to assume that the regulation is valid. We note that Congress has since incorporated the regulation, virtually verbatim, into law, thus removing any question of validity. *See* I.R.C. § 901(i) (as amended by Pub.L. 99–514, § 1204(a), 100 Stat. 2085, 2532 (1986)). However, since this amendment did not go into effect until tax year 1986, well after the tax year at issue in the present case, we must apply the previous version of the statute and constructions thereof. We also find that, under our disposition of the case, the differences between direct loans and repass loans have no bearing on the outcome.

### III.

The more difficult question is when, if ever, an executive agency's regulation can trump a court's established precedent interpreting an act of Congress. Bankers Trust asserts, and the Government does not dispute, that a series of cases known as the Mexican Railroad Car cases, decided by the United States Court of Claims (one of our predecessor courts), is directly on point. The Mexican Railroad Car cases involved American companies that rented railroad cars to Mexican railroads (primarily the government-run railroad). At the time the cases were decided, rentals within the U.S. and Canada were generally at the rate of $2.40/car/day, while in Mexico they were $3.40/car/day.

Mexico subsequently established a tax of 10% on rental income paid to foreign com-

panies. In response to the tax, the American companies that provided the cars for rent, the Mexican railroads, and the Mexican government met and concluded that it was impossible to keep track of the railroad car rental income with sufficient accuracy to ensure correct payment of the tax. The parties therefore agreed that the Mexican railroads would henceforth pay $2.40 to the American rental companies and withhold the remaining $1.00 to pay as 'tax' to the Mexican government. The Mexican government would then promptly refund the money to the Mexican railroads as a subsidy.

The American companies claimed that the $1.00 tax that was paid to the Mexican government was entitled to foreign tax credit treatment under § 901. The IRS refused to allow the credit, and a series of cases dealing with the issue came before the Court of Claims. *See, e.g., Chicago, Burlington, & Quincy R.R. Co. v. United States,* 197 Ct.Cl. 264, 455 F.2d 993 (1972) [hereinafter *CB & Q R.R.*]; *Missouri Pac. R.R. Co. v. United States,* 204 Ct.Cl. 837, 497 F.2d 1386 (1974).

In *CB & Q R.R.,* the court focused on the agreement terms and the manner in which the Mexican railroads withheld the taxes, and concluded that it was a proper tax. The court acknowledged that the tax was immediately refunded to the railroads, but it dismissed the importance of this fact by stating "[t]his is wholly an internal Mexican affair that is of no concern to us." 455 F.2d at 1023. The court therefore concluded that the American rental companies were entitled to claim the FTC on the $1.00 tax. Judge Nichols dissented, suggesting that the transaction was essentially a tax sham and that no 'tax' was paid at all. *See id.* at 1026–27 (Nichols, J., dissenting).

■ Bankers Trust maintains that these cases dictate a judgment in its favor in the present case. Given the virtual identity of the Brazilian and Mexican transactions, this argument would appear to be unassailable—Court of Claims cases, until overturned by this court en banc, are binding precedent, *see South Corp. v. United States,* 690 F.2d 1368, 1370–71 (Fed.Cir. 1982), and adherence to stare decisis would mandate reversal. The Court of Federal Claims recognized that, since it is bound by this court's law, it, too, is required to follow Court of Claims precedent.

The Court of Federal Claims, however, noted that in our decision in *Texas American Oil Co. v. United States Department of Energy,* 44 F.3d 1557, 1561 (Fed.Cir. 1995) (en banc) we recognized that we did not follow otherwise precedential decisions that were "overruled by the court en banc, or by other controlling authority such as an intervening statutory change or Supreme Court decision." The Court of Federal Claims concluded that a change in a regulation, such as the promulgation of Temporary Treasury Regulation § 4.901–2(f), qualified as "other controlling authority," and it therefore held that it was not required to follow the Mexican Railroad Car cases.

The Government supports the Court of Federal Claims's reading of *Texas American Oil* by citing to the *Chevron* doctrine. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The Government asserts that we must defer to the IRS's reasonable interpretation of the statute as expressed in Temporary Treasury Regulation § 4.901–2(f). In effect, the Government is of the view that the subsequent passage of the regulation effectively 'overruled' the Mexican Railroad Car cases.

In support of its view that *Chevron* prevails, the Government cites *Mesa Verde Construction Co. v. Northern California District Council of Laborers,* 861 F.2d 1124 (9th Cir.1988) (en banc). In *Mesa Verde,* the Ninth Circuit en banc extensively discussed the issue of deference to an agency after the agency interprets a statute in a manner contrary to a prior judicial determination; the opinion includes three separate dissents on the issue. At issue in Mesa Verde was the NLRB's

interpretation of section 8(f) of the NLRA as not permitting unilateral termination of pre-hire employment contracts. This interpretation was contrary to the prior position of the NLRB, which position had been adopted in a precedential opinion by a prior panel of the Ninth Circuit. The court was called upon to grapple with the issue of whether a later panel of the court was free to adopt the NLRB's new position, or whether it was bound by the prior panel's adoption of the earlier position. A majority of the court en banc concluded that a panel of the court was free to adopt the later agency interpretation as its own, without the necessity of an en banc overruling of the earlier opinion. *See id.* at 1136.

The Government argues that *Mesa Verde* correctly resolved the issue, and that the conclusion that the court owes deference to the regulation rather than to its own precedent should prevail here as well. It is true that the dissenters in *Mesa Verde* seemed to view the majority holding as one under which "the judges become the handmaidens of the agency, relegated to deciding not what the law is, but only whether the agency's construction of the law is reasonable." 861 F.2d at 1146 (Kozinski, J., dissenting). "In the name of administrative deference, the majority would deprive this court of its role of divining Congressional intent behind a statutory provision, and assign that role to the agency charged with administering the statute." *Id.* at 1145 (Hug, J., dissenting).

Such dire descriptions of another court's view of an issue would give us considerable pause before we adopted that view. But we need not reject the Government's position on that ground alone. *Mesa Verde* is readily distinguishable from the present case. The *Mesa Verde* court specifically limited its holding to the situation in which the original precedent "constituted deferential review of [agency] decisionmaking." *Id.* at 1136. The court went on to say that if the original decision found the original agency interpretation unreasonable or concluded that the court's interpretation was the only one possible, then a later panel

was bound by the court's precedent, notwithstanding a change in the agency's regulations. *See id.* Thus, *Mesa Verde* fails to address the present situation, in which the original interpretation by this court was not based on deference to an agency interpretation.

The Court of Federal Claims supported its departure from stare decisis with a citation to *Gibraltar Financial Corp. v. United States,* 825 F.2d 1568 (Fed.Cir. 1987). In that case this court addressed a complicated tax issue, one which had previously been dealt with by the Ninth Circuit. This court indicated that "uniformity among the circuits is particularly desirable in tax cases," but went on to state that "we are not inclined to reach a result in conflict with the Ninth Circuit unless the statute or precedent of this court gives us, in our view, no alternative." *Id.* at 1572 (emphasis added) (footnote omitted).

In *Gibraltar,* the IRS was relying on a Treasury regulation that had been found valid by the Ninth Circuit, while the taxpayer was relying on an earlier Court of Claims precedent that was arguably inconsistent with the regulation. The trial court had found the earlier Court of Claims precedent controlling, and refused to apply the regulation. This court reversed and deferred to the regulatory interpretation, but only after finding that the Court of Claims precedent "did not address the question here." *Id.* The inclusion of "precedent of this court" in the qualification quoted above, and the fact that the court found it necessary to distinguish the Court of Claims precedent as not on point, clearly undercuts the use of the case as authority for preferring a regulation over a controlling precedent.

Bankers Trust, in support of its argument that stare decisis trumps the new regulation even under *Chevron* deference, cites to *Neal v. United States,* 516 U.S. 284, 116 S.Ct. 763, 133 L.Ed.2d 709 (1996). The issue in *Neal* was whether interpretations of the federal Sentencing Guidelines by the United States Sentencing Commis-

sion could overrule prior Supreme Court interpretations of the mandatory minimum sentencing statute. Assuming for argument's sake that the Commission intended the revised interpretation to have that effect, the Court considered the effect of its prior precedent on the Commission's revised interpretation. The Court summarily (and unanimously) concluded that its prior precedent must trump any effort by the Commission to modify that precedent:

> Once we have determined a statute's meaning, we adhere to our ruling under the doctrine of stare decisis, and we assess an agency's later interpretation of the statute against that settled law.

*Id.* at 295, 116 S.Ct. 763.

The Court's pronouncement in *Neal* is unequivocal in its assertion that the Court's interpretation of a statutory provision trumps a subsequent agency interpretation that is inconsistent with the Court's precedent. The Government in its brief to this court does not address *Neal,* although in a footnote it acknowledges similar language from *Maislin Industries, U.S., Inc. v. Primary Steel, Inc.,* 497 U.S. 116, 131, 110 S.Ct. 2759, 111 L.Ed.2d 94 (1990) (a prior decision that formed part of the basis for the decision in *Neal* ) but explains away the Court's statement with the bald assertion that "[d]ecisions of the Supreme Court are an exception."

On the contrary, the Supreme Court's reasons for adhering to its prior decisions in this context reflect the relationship of the Judiciary to Congress and the ability of Congress to change its statutes to correct a misinterpretation by the Court. *See Neal,* 516 U.S. at 295–96, 116 S.Ct. 763. These reasons would seem to apply equally to decisions rendered by circuit courts of appeal. Indeed, perhaps stare decisis should be viewed as even stronger at the court of appeals level, since erroneous interpretations of statutes are correctable not only by Congress, but also by the court itself sitting en banc, as well as by the Supreme Court.

Bankers Trust also cites *BPS Guard Services, Inc. v. NLRB,* 942 F.2d 519 (8th Cir.1991). In *BPS,* the Eighth Circuit flatly stated "*Chevron* does not stand for the proposition that administrative agencies may reject, with impunity, the controlling precedent of a superior judicial body," *id.* at 523, and that the NLRB completely lacked " 'the power or authority to disagree, respectfully or otherwise, with decisions of this court,' " *id.* at 524 (quoting *Allegheny Gen. Hosp. v. NLRB,* 608 F.2d 965, 970 (3d Cir.1979)). The court specifically rejected the NLRB's *Chevron* argument to the contrary and held that circuit precedent trumped subsequent agency determinations. *See id.* at 523–24.

In *United States v. Joshua,* 976 F.2d 844 (3d Cir.1992), the Third Circuit extensively addressed a circuit split involving a similar question. *See id.* at 853–56. At issue were the Federal Sentencing Commission's published interpretations of the Federal Sentencing Guidelines regarding career offenders and the meaning of "crime of violence." The Commission made a 'clarifying amendment' to its interpretation of a Guideline in a way that conflicted with the previous holdings of several circuits, including two prior decisions of the Third Circuit itself, and the panel of the Third Circuit was called upon to decide whether to follow the new interpretation or its own precedent. The court noted that the Tenth and Eleventh Circuits had taken the view that the Commission could not overturn their precedents by amending the interpretation, while the Fifth and D.C. Circuits had held that the revised interpretation nullified the prior judicial ruling. *See id.* at 853–54.

The Third Circuit took a middle ground, concluding that the Commission obviously could not directly overrule circuit precedent, but it was authorized to make the amendment and the court could properly consider the change. The court stated:

> Where a prior panel of this court has interpreted an ambiguous statute in one way, and the responsible administrative agency later resolves the ambiguity in another way, this court is not bound to

close its eyes to the new source of enlightenment. In addition to securing the expertise of the agency, this approach tends to promote uniformity in the application of the statute.

*Id.* at 855. The court decided that it would follow the Commission's interpretation rather than its own precedent. *See id.* at 856.

### IV.

After considering the arguments on both sides, and fully reviewing the positions taken by our sister circuits in related cases, we conclude that the Court of Federal Claims erred in holding that, on the facts of this case, an Executive agency regulation could effectively construe a statute in a manner different from a prior definitive court ruling. The *Chevron* doctrine, properly understood, does not change this basic application of Separation of Powers doctrine. The *Chevron* doctrine, which requires us to defer to reasonable agency 'gap-filling' interpretations of a statute as expressed in agency regulations, is not in conflict with stare decisis as it applies to this case, which requires adherence to precedential decisions of this court and of our predecessor courts.

Our disposition of the case is consistent with the Supreme Court's pronouncement in *Neal* and with our own approach in *Gibraltar.* One of our predecessor courts, by whose precedent we are bound, has already decided the statutory interpretation question before us. This is not a case like *Mesa Verde,* in which the original decision was itself based on deference to the agency; under such circumstances, we might well consider the agency's change of heart as a significant factor. In the present case, however, the original decision was based on direct judicial construction of the statute, not deference to the IRS. While we might question the wisdom of the Court of Claims's decision in the Mexican Railroad Car cases, until those cases are overturned (or until the later amendment to the statute is effective), the law of this circuit is as those cases pronounce.

We recognize that this has the effect of creating inconsistency with the outcomes in the parallel cases of the Seventh and Eighth Circuits, discussed above. However, we also recognize that to hold otherwise, giving priority to the regulation, creates its own set of problems, not the least of which would be to countenance an agency's ability to overturn any unfavorable court decision by way of regulations. See the discussion of *Mesa Verde,* supra. It is a fundamental principle of Constitutional law that the duty to interpret the statutes as set forth by Congress is a duty that rests with the judiciary: "It is, emphatically, the province and duty of the judicial department, to say what the law is." *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 176, 2 L.Ed. 60 (1803). In executing this duty, we may not give the IRS or any executive branch agency the power to overrule an established statutory construction of the court—a power that, with regard to our prior precedents, even a later panel of this court lacks. We will follow our precedent, and leave harmonization of the circuits to the Supreme Court and Congress. In any event, with regard to the problem in front of us, Congress has already acted to provide national uniformity when it amended the statute in 1986; the holding in the Mexican Railroad Car cases has only limited vitality.

### CONCLUSION

The decision of the Court of Federal Claims is reversed, and the matter is remanded for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**